UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION


KEWEENAW BAY INDIAN COMMUNITY,

      Plaintiff,

                                  File No: 2:16-cv-121
v.

                                  HON. PAUL L. MALONEY
NICK KHOURI, et al.,

      Defendants.

_____/


## OPINION

Plaintiff Keweenaw Bay Indian Community ("the Community") is a federally-recognized American Indian tribe organized under the Indian Reorganization Act of 1934, 25 U.S.C. § 476. It has approximately 2,625 enrolled members, and approximately 1,044 residents on its reservation. The Community seeks declaratory and injunctive relief for Defendants' alleged violations of federal law and unlawful interference with the Community's federally-sanctioned activities. (Third Am. Compl., ECF No. 58.) The Community alleges that Defendants have enforced, and continue to enforce, the Michigan Sales Tax Act, the Michigan Use Tax Act, and the Michigan Tobacco Products Act ("Tobacco Act") in violation of federal law. (*Id.*)

The Defendants are Nick Khouri, the Treasurer of the State of Michigan, Walter Fratzke, the Native American Affairs Specialist for the Department of Treasury ("the Department"), Ruth Johnson, the Secretary of State for the State of Michigan, Sergeant Christopher Croley, an officer with the Michigan State Police, Daniel Grano, an Assistant Attorney General for the State of Michigan, and Detective Timothy Sproull, an officer with the Michigan State Police.

The matter is before the Court on Defendants' motion for judgment on the pleadings for the official-capacity tobacco-tax claims. (ECF No. 68.) The Community has filed a response (ECF No. 73), and Defendants have filed a reply (ECF No. 75). Upon careful review of the record, the Court has decided that the motion can be resolved without oral argument. *See* W.D. Mich. LCivR 7.3(d). For the reasons that follow, Defendants' motion is granted in part and denied in part.

## I.

The L'Anse band of Chippewa Indians have long occupied the area near the base of the Keweenaw Bay in Michigan's Upper Peninsula. Under the Treaty with the Chippewa at La Pointe (the "1842 Treaty"), the Chippewa Indians ceded to the United States the western half of Michigan's Upper Peninsula, including the Keweenaw Bay area ("ceded area"). Treaty with the Chippewa, Oct. 4, 1842, 7 Stat. 591, 1842 WL 6508. This treaty provided that "[t]he Indians stipulate for the right of hunting on the ceded territory, with the other usual privileges of occupancy, until required to remove by the President of the United States, and that the laws of the United States shall be continued in force, in respect to their trade and intercourse with the whites, until otherwise ordered by Congress." *Id.* at art. 2. In 1854, the United States set nearly 60,000 acres near the base of the Keweenaw Bay as an Indian reservation for the L'Anse and Lac Vieux Desert Bands of Chippewa Indians. Treaty with the Chippewa, Sept. 30, 1854, 10 Stat. 1109, 1854 WL 9483. The Community's reservation is located within this area.

In 1977, the Community and the State of Michigan entered into a tax agreement. As part of the agreement, the State acknowledged the nontaxable status of the Community and its members with respect to state sales and use taxes. In 1997, the State terminated this tax agreement, and the parties have been unable to reach a new agreement.

The Department has established a form process that allows tribes without a tax agreement with the State to file claims for exemption from or refund of sales and use taxes with respect to purchases, leases, rentals, use, storage, or consumption of tangible personal property or services within Indian country. Under this process, tribes and tribal members must either pay sales tax and use tax at the time of the transaction or file a claim requesting an advance determination that a particular transaction is not subject to sales and use tax. If an advance determination is not obtained, the purchaser must pay the tax at the time of sale and then submit a claim for refund of the tax paid. This refund process also applies to the tobacco tax.

In 2003, the Community filed a lawsuit against the Treasurer of the State of Michigan, the Administrator of the Tax Policy Division of the Michigan Department of Treasury, the United States Postmaster General, employees of the United States Postal Service, and several Michigan State Police officers. (*Keweenaw Bay Indian Cmty. v. Rising*, No. 2:03-CV-111 (W.D. Mich. May 29, 2003), ECF No. 1) ("*Rising I*"). The Court granted the defendants' motion for summary judgment on several tobacco-tax claims, granted the defendants' request to dismiss claims that would extend the Community's sovereignty into the area ceded under the 1842 Treaty, and dismissed part of the Community's § 1983 claim. (*Id.* at ECF Nos. 96, 301.) The Sixth Circuit affirmed this decision and held that the tobacco tax was valid because the incidence of the tax fell on non-tribal consumers; that it did not impose more than a minimal burden on the tribe; that it comported with prior treaties; that the State's search of packages did not infringe the Supremacy Clause or exclusive federal authority over mail; that the tribe's sovereign immunity did not preclude search of the mail packages; and that the search warrants for the mail packages met the Fourth Amendment's particularity requirement. *Keweenaw Bay Indian Cmty. v. Rising*, 477 F.3d 881, 886-95 (6th Cir. 2007).

Here, the Community alleges that, since January 1, 2013, it submitted approximately 991 claims for exemption or refund to the Department relating to purchases of tangible personal property and services. The Community objects to the necessity of participating in the Department's claim process in order to exercise its immunities from state taxation under federal law. Of these claims, the Department denied approximately 900, granted approximately 58, and has yet to rule on the 33 remaining claims. The Community also alleges that, since July 1, 2012, four Community members have submitted approximately 254 claims for exemption or refund to the Department related to purchases of a wide variety of tangible personal property and services. The Department has denied approximately 161 claims, and has granted 68 claims; 25 claims remain.

The Community alleges that the State has unlawfully enforced the Tobacco Act, Mich. Comp. Laws § 205.427(1), which imposes a tax on the sale of tobacco products, including cigarettes, sold in Michigan. The Act requires licensed wholesalers and unclassified acquirers other than a manufacturer to remit the tobacco tax and a tax return to the Department by the twentieth day of each calendar month for products sold during the preceding month. Mich. Comp. Laws § 205.427(2) and (3). A "wholesaler" is a person who purchases tobacco products from a manufacturer, sells 75% or more of those products to others for resale, and maintains an established business where substantially all of the business is the sale of tobacco products at wholesale and a substantial stock of tobacco products is available to retailers for resale. Mich. Comp. Laws § 204.422(cc). An "unclassified acquirer" is a person who is not a transportation company or a purchaser at retail from a licensed retailer, and "who imports or acquires a tobacco product from a source other than a wholesaler or secondary wholesaler licensed under this act for use, sale, or distribution." Mich. Comp. Laws § 205.244(z).

The Tobacco Act provides that "a person shall not purchase, possess, acquire for resale, or sell a tobacco product as a manufacturer, wholesaler, secondary wholesaler, vending machine operator, unclassified acquirer, transportation company, or transporter in this state unless licensed to do so." Mich. Comp. Laws § 205.423. A "transporter" means a person importing or transporting into the State, or transporting in the State, a tobacco product obtained from a source located outside of the State, or from any person not duly licensed under the Act, but does not include an interstate commerce carrier licensed by the interstate commerce commission to carry commodities in interstate commerce. Mich. Comp. Laws § 205.422(y). The Act also requires a wholesaler and unclassified acquirer to affix a stamp provided by the Department to the bottom of each individual package of cigarettes to be sold within the State before delivery, sale, or transfer of the cigarette package to any person in the State. Mich. Comp. Laws § 205.426a(2). A retailer or any person licensed under the Act is not permitted to acquire any package of cigarettes for resale unless the package has that stamp. Mich. Comp. Laws § 205.426a(3). Any tobacco products that violate the Act may be seized and confiscated by the Department. Mich. Comp. Laws § 205.429(1).

The Community sells tobacco products on the reservation or the trust lands at several locations that are wholly owned and operated by the Community. This area is considered "Indian country" as defined by federal law.

On December 4, 2015, the Community purchased 3,360 cartons of Seneca cigarettes for $65,620.80 from HCI Distribution, an economic development arm of the Winnebago Tribe of Nebraska. The Community sent a pickup truck and utility trailer, driven by John Davis, an enrolled member of the Community, to transport the cigarettes from HCI's facilities to the Community's reservation. On December

11, 2015, Michigan State Trooper Lajimodiere stopped the truck in the ceded area of Marquette County for speeding. The trooper did not issue a speeding citation. The Community alleges that the Michigan State Police were conducting an illegal surveillance investigation into the operations on the reservation. Trooper Lajimodiere contacted the Michigan State Police Tobacco Tax Enforcement Team for assistance, and several members responded to his call. They seized the Community's cigarettes, truck, and trailer.

The Community requested an administrative hearing under Mich. Comp. Laws § 205.429(3) to contest the seizure. On January 22, 2016, the Department held a hearing to determine whether the cigarettes, truck, and trailer were lawfully seized and subject to forfeiture to the State. The Community alleges that it was not allowed to question the Department's witnesses during the hearing. The hearing referee recommended that the Department find that the cigarettes and trailer were lawfully seized and subject to forfeiture, but that the seizure of the truck was unlawful. The Department rejected the latter portion of the recommendation, and on February 5, 2016, it issued a decision and order of determination that the Community's truck, trailer, and cigarettes were lawfully seized and subject to forfeiture. The Community brought an action in state court challenging the decision and order, but is seeking a stay of the state-court proceedings pending the outcome of this case.

On January 28, 2016, the Community purchased 184 cartons of Seneca brand cigarettes for $197,715 from Native Wholesale Supply. The wholesaler shipped the cigarettes in two shipments of 92 cases to the Community via XPO Logistics Freight, Inc., a common-carrier trucking company licensed by the U.S. Department of Transportation Federal Motor Carrier Safety Administration. On February 9, 2016, the Michigan State Police stopped one of the XPO trucks in Marquette County, within the ceded area. The Department seized the 92 cases of cigarettes based on its determination that the cigarettes were

untaxed. That same day, the Michigan State Police stopped the second XPO truck, again, within the ceded area. The Department seized the remaining 92 cases of cigarettes after determining that they were also untaxed.

The Community once again requested administrative hearings for the February 9th seizures. On March 16, 2016, the Department held a hearing. The Community alleges that the hearing referee presumed that the Tobacco Act was constitutional, and did not allow the Community to present argument or evidence on whether the seizure violated the Constitution or federal law. Once again, the Community alleges that the referee did not allow the Community to question the Department's witnesses during the hearing. The referee found that, when an individual package of cigarettes is located in the State without the required tobacco tax stamp, there is a presumption that the package violates the Act. The referee also found that the cigarettes did not contain the required stamp, were contraband, and that the Community was acting as an unclassified acquirer without a license. The referee recommended that the Department find that the Michigan State Police lawfully seized the cigarettes and that they were subject to forfeiture. The Department accepted the referee's recommendation in its decision and order of determination. The Community also filed a lawsuit in state court to challenge this decision.

In August 2016, the Department provided the Community with a notice of intent to assess taxes and penalties against the Community for the tobacco products seized on December 11, 2015 and February 9, 2016. In response, the Community's Tribal Council President submitted a written demand to the State Treasurer for an informal conference. The Community contested the entire amount of the alleged tax liability and penalties for four reasons: (1) the Department failed to comply with the statutory requirements under Mich. Comp. Laws § 205.21(2)(a), which are prerequisites for issuing a notice of intent to assess

taxes; (2) the Department also failed to comply with Mich. Comp. Laws § 205.21(2)(b), which describes the required elements of a valid notice of intent to assess; (3) the notices of intent to assess are unlawful under the Tobacco Act; and (4) the notice, if carried out, would violate the U.S. Constitution and federal law. All of these claims are part of the state-court litigation.

On October 4, 2016, state officials signed a felony complaint and sought arrest warrants against two of the Community's members for violations of the Tobacco Act. In response to the criminal investigation, the Community added two defendants in their individual and official capacities. These individuals are Assistant Attorney General Daniel Grano, who signed a felony complaint and sought an arrest warrant against the Community's members, and Michigan State Police Officer Timothy Sproull, who is responsible for enforcing the Tobacco Act and is the complaining witness to the felony complaint. The Community requests an injunction to prevent Defendants from taking any further actions to impose or collect Michigan's tobacco products tax, including conducting surveillance or investigations on the Community's reservation and filing or pursuing criminal prosecutions against Community members or employees.

## II.

Under Federal Rule of Civil Procedure 12(c), "a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The Court is to apply the same standard to a motion for judgment on the pleadings that it applies to a motion to dismiss under Rule 12(b)(6). *Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n*, 623 F.3d 281, 284 (6th Cir. 2010) (citing *EEOC v. J.H. Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 1973)). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be

granted only if the moving party is nevertheless clearly entitled to judgment." *JP Morgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (quoting *Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 479 F.2d 478, 480 (6th Cir. 1973)).  The Court, however, "need not accept as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 11 (6th Cir. 1987).

Although the decision on the motion "rests primarily upon the allegations of the complaint," the Court may also consider "matters of public record," "orders," and materials in "the record of the case," among other things. *Barany-Snyder v. Weiner*, 539 F.3d 327, 332 (6th Cir. 2008) (internal citations and quotations omitted).  For example, it "may take judicial notice of its own record of another case between the same parties." *Harrington v. Vandalia-Butler Bd. of Educ.*, 649 F.2d 434, 441 (6th Cir. 1981). Thus, the Court should grant a Rule 12(c) motion "when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Winget*, 510 F.3d at 581 (quoting *Paskvan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991)).

## III.

### C. Res judicata applies

The Community argues that res judicata does not apply to tax claims unless the question of liability for the same tax period is raised again in a subsequent action, relying upon *Commissioner v. Sunnen*, 333 U.S. 591, 598 (1948). *Id.* ("[I]f a claim of liability or non-liability relating to a particular tax year is litigated, a judgment on the merits is res judicata as to any subsequent proceeding involving the same claim and the same tax year.").  Defendants distinguish *Sunnen*: Federal Indian tax cases are different from ordinary tax cases because federal Indian principles, not simply tax law, resolve these disputes.  Defendants

also argue that the Community is not a taxpayer under the Tobacco Act and that the case does not involve determining the amount of an annual tax liability, so *Sunnen* and the other cases that the Community relies upon do not bar the application of res judicata here. The Community contends that, because the Community is required to pay the tax to obtain tobacco products under the Defendants' interpretation of the Tobacco Act, Defendants cannot avoid *Sunnen* by arguing that the Community is not a taxpayer or is not bringing a tax claim.

In *Sunnen*, the Supreme Court held that a decision concerning an annual federal tax liability bars an action in later years for the same tax. *Id.* at 598 (explaining that "[e]ach year is the origin of a new liability and of a separate cause of action"). The Court noted that, "where the second action between the same parties is upon a different cause or demand, the principle of res judicata is applied much more narrowly." *Id.* at 597-98. Res judicata "is designed to prevent repetitious lawsuits over matters which have once been decided and which have remained substantially static, factually and legally." *Id.* at 599. Thus, "[i]f the legal matters determined in the earlier case differ from those raised in the second case," or if "the situation is vitally altered between the time of the first judgment and the second, the prior determination is not conclusive." *Id.* (internal citations omitted). However, "where a question of fact essential to the judgment is actually litigated and determined in the first tax proceeding, the parties are bound by that determination in a subsequent proceeding even though the cause of action is different." *Id.* at 601 (citing *Evergreens v. Nunan*, 141 F.2d 927 (2d Cir. 1944)). Because the Community's claims rely on more than just federal tax law, res judicata applies.

**B. Res judicata analysis**

Defendants argue that res judicata bars the official-capacity tobacco claims against Defendants

Khouri, Fratzke, Croley, Grano, and Sproull. Res judicata, or claim preclusion, "provides that a final judgment on the merits of an action precludes the 'parties or their privies from relitigating issues that were or could have been raised' in a prior action." *Kane v. Magna Mixer Co.*, 71 F.3d 555, 560 (6th Cir. 1995) (quoting *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981)). It has four elements: (1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their privies; (3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and (4) an identity of the causes of action. *Id.* (quoting *Sanders Confectionary Prods., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 480 (6th Cir. 1992), *cert. denied*, 506 U.S. 1079 (1993)). "'The burden of proving the applicability of the doctrine of res judicata is on the party asserting it.'" *Abbott v. Michigan*, 474 F.3d 324, 331 (6th Cir. 2007) (quoting *Baraga Cty. v. State Tax Comm'n*, 645 N.W.2d 13, 16 (Mich. 2002)). The Court must apply the doctrine of res judicata "with its limitations carefully in mind so as to avoid injustice." *Sunnen*, 333 U.S. at 599.

### 1. Final decision on the merits

Defendants argue that this Court's decision in *Rising I*, including two opinions granting summary judgment and a clarifying opinion, satisfy the first element for the tobacco-tax claims. (*Rising I*, No. 2:03-cv-111 at ECF Nos. 96, 125, 301.) A district court's grant of summary judgment is a final decision on the merits. *Pavlovich v. Nat'l City Bank*, 461 F.3d 832, 835-36 (6th Cir. 2006); *Mayer v. Distel Tool & Mach. Co.*, 556 F.2d 798, 798 (6th Cir. 1977). Further, in *Rising I*, this Court had jurisdiction under 28 U.S.C. § 1331 and § 1362, so it was also a court of competent jurisdiction. Thus, the first element is satisfied.

11

## 2. Subsequent action between the same parties or their privies

In the context of res judicata, courts "use the word 'privity' or 'privy' in [a] broader sense, 'to say that the relationship between one who is a party on the record and another is close enough to include that other within res judicata.'" *In re Montogmery Ward, LLC*, 634 F.3d 732, 737-38 n.6 (3d Cir. 2011) (quoting *Nationwide Mut. Fire Ins. Co. v. Hamilton*, 571 F.3d 299, 311 n.13 (3d Cir. 2009)). Privity is a "legal conclusion 'designating a person so identified in interest with a party to former litigation that he represents precisely the same right in respect of the subject matter involved.'" *In re Schimmels*, 127 F.3d 875, 881 (9th Cir. 1997) (quoting *Southwest Airlines Co. v. Texas Int'l Airlines, Inc.*, 546 F.2d 84, 94 (5th Cir. 1977)).

In *Rising I*, the Community brought suit against state officials in their official capacities, which "is no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Although Defendants Khouri, Fratzke, Croley, and Sproull were not parties in *Rising I*, they all are in privity with the Treasurer and members of the Michigan State Police, whom the Community sued in their official capacity in *Rising I*. *See Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 402-03 (1940) ("There is privity between officers of the same government so that a judgment in a suit between a party and a representative of [the government] is res judicata in relitigation of the same issue between that party and another officer of the government.") (citing *Tait v. W. Maryland Ry. Co.*, 289 U.S. 620 (1933)).

The Community did not sue an assistant attorney general or the former Attorney General in *Rising I*. Nonetheless, Defendant Grano is in privity with the defendants in *Rising I*. *See Micklus v. Greer*, 705 F.2d 314, 317 (8th Cir. 1983) ("A plaintiff may not sue a succession of state employees on the same claim solely on the ground that each employee is not 'identical' to previously sued employees. . . . Thus, we find

there is in this case the 'close relationship, bordering near identity' required to apply res judicata.") (quoting *Robbins v. Dist. Court of Worth Cty.*, 592 F.2d 1015, 1017 (8th Cir. 1979)). The Sixth Circuit has applied *Micklus*, finding that, although the plaintiff "named different state employees in the second case, he [was] barred from raising the same claim against them as they are in privity with the previous defendants." *Jackson v. Pline*, 974 F.2d 1338, 1992 WL 203760, at *1 (6th Cir. Aug. 20, 1992) (unpublished table opinion). Defendant Grano, whose job is to enforce the Tobacco Act, (ECF No. 58, PageID.794), is in privity with the defendants in *Rising I* who were also tasked with the Act's enforcement; thus, the second element for res judicata is satisfied for all of the official-capacity tobacco claims.

**3. Issues that were actually litigated or that could have been litigated in the prior action**

Res judicata prohibits not only the relitigation of all claims or issues which were actually litigated in a prior proceeding, but also those that could have been litigated in the prior action. *Bragg v. Flint Bd. of Educ.*, 570 F.3d 775, 777 (6th Cir. 2009). Defendants argue that all of the official-capacity tobacco tax claims were actually litigated or could have been litigated in *Rising I*.

Here, Counts IX, X, XI, XII, XIII, XIV, and XVII relate to the tobacco tax. (ECF No. 58.) Although some of the Community's legal arguments either actually were litigated or could have been litigated in *Rising I*, the facts underlying the Community's claims were not available until nearly 10 years after the Sixth Circuit's decision. Thus, the Community did not and could not have raised these claims in *Rising I.*

**4. Identity of the causes of action**

The fourth and final element of res judicata requires that there be an identity of claims. "Identity of causes of actions means an 'identity of the facts creating the right of the action and of the evidence

13

necessary to sustain each action.'" *Sanders Confectionary Products, Inc v. Heller Financial, Inc.*, 973 F.2d 474, 484 (6th Cir. 1992) (quoting *Westwood Chemical Co. v. Kulick*, 656 F.2d 1224, 1227 (6th Cir. 1981)). "The now-accepted test in preclusion law for determining whether two suits involve the same claim or cause of action depends on factual overlap, barring 'claims arising from the same transaction.'" *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 316 (2011) (quoting *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 482 n.22 (1982)); *see also Browning v. Levy*, 283 F.3d 761, 773-74 (6th Cir. 2002) (citation omitted) (explaining that identity of claims "is satisfied if 'the claims arose out of the same transaction or series of transactions, or whether the claims arose out of the same core of operative facts.'").

Although *Rising I* consisted of similar facts, here, the facts underlying the complaint did not arise until nearly 10 years after the Sixth Circuit's decision in *Rising I*. Indeed, the two cases have different factual bases, arising years apart from one another, and do not rely on the same evidence in order for the Community to prove its claims. *See Butler v. FCA US, LLC*, 119 F. Supp. 3d 699, 708 (E.D. Mich. 2015) (explaining that where two causes of actions have different factual bases and evidence, they did not share an identity of cause of action).

Defendants argue that the Court only needs two facts to determine whether the seizures and other sanctions were lawful: (1) whether the tobacco products were contraband; and (2) whether the seizures occurred outside of Indian Country. *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 161-62 (1980). Although this is true, the seizures and sanctions at issue here occurred years after the litigation in *Rising I* finished. The claims are not related in time, space, origin, or motive. The Community's claims address seizures of different tobacco products, in different places, under

14

different circumstances, during different years, and in different tax periods than those at issue in *Rising I*. Thus, this case does not "involve the same set of events or documents [or] the same bundle of legal principles that contributed to the rendering of the first judgment." *Sunnen*, 333 U.S. at 601-02 (citing *Tait*, 289 U.S. at 620).

## B. Collateral estoppel

Defendants do not explicitly raise an argument for collateral estoppel in their brief in support of their motion for judgment on the pleadings. Rather, Defendants generally discuss the application of res judicata, arguing "*Rising I* litigated or could have litigated each of these claims." (ECF No. 69, PageID.1029.) Defendants also argue that "[r]es judicata does not permit the Community to re-litigate the same legal to achieve a different and better outcome for seizures presenting the same essential facts." (*Id.* at PageID.1044.) Nonetheless, in its response brief, the Community argues that collateral estoppel, or issue preclusion, also does not bar the Community's claims. (ECF No. 72, PageID.1067.) Defendants respond to this argument in their reply brief, but also include a footnote requesting that, if the Court denies its motion, Defendants be allowed to brief the collateral estoppel issue fully and reserve the right to challenge the claims on their merits and assert other defenses. (ECF No. 75, PageID.1142.)

"Raising a new argument in a reply brief is patently improper." *Swartz v. Comm'r of Social Sec.*, No. 1:07-cv-771, 2008 WL 2952021, at *5 (W.D. Mich. July 29, 2008). A party cannot wait until the reply brief to make new arguments, thus effectively depriving the opposing party of the opportunity to expose the weaknesses of the argument. *Id.* (quoting *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008)). But that is not what happened here; the Community first raised the issue in its response brief, so the Sixth Circuit's concerns underlying *Scottsdale* do not apply. Further, Defendants raised the

affirmative defense of collateral estoppel in their answer to the Community's amended complaint. (ECF No. 63, PageID.1008.) Thus, the Court will assess the merits of the argument.

"Once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States*, 440 U.S. 147, 153 (1979) (internal citations omitted). For issue preclusion to apply, Defendants must show that (1) the issue in the subsequent litigation is identical to that resolved in the earlier litigation; (2) the issue must have been actually litigated and decided in the prior action; (3) the issue must have been necessary and essential to a judgment on the merits in the prior litigation; and (4) the party to be estopped was a party to the prior litigation or in privity with such a party. *Hickman v. Comm'r*, 183 F.3d 535, 537 (6th Cir. 1999).

Collateral estoppel is generally appropriate if both the first and second action involve application of the same principles of law to a historic fact setting that was complete by the time of the first adjudication. 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure Jurisdiction and Related Matters* § 4425 (3d ed. 2017) (citing *Steen v. John Hancock Mut. Life Ins. Co.*, 106 F.3d 904, 913 (9th Cir. 1997) and *Jarvis v. Nobel/Sysco Food Servs. Co.*, 985 F.2d 1419, 1425 (10th Cir. 1993)). Substantial uncertainty is encountered, however, in dealing with preclusion on issues of applying law to facts that seem indistinguishable but were not closed at the time of the first adjudication. *Id.* Such facts are often called "separable," and preclusion may be denied simply because of factual separability. *Id; see also Sunnen*, 333 U.S. at 601 ("But if the relevant facts in the two cases are separable, even though they be similar or identical, collateral estoppel does not govern the legal issues which recur in the second case.").

The relevant facts from *Rising I* and the present matter are similar, and in some respects, nearly identical. Nonetheless, they are separable because the facts at issue here were not closed at the time of *Rising I*'s adjudication. Thus, collateral estoppel does not govern the recurring legal issues.

### C. *Rising I* as binding precedent

Defendants also contend that if neither res judicata or collateral estoppel apply, Defendants are still entitled to judgment on the pleadings based on *Rising I*. Indeed, the Court is bound by the decisions in *Rising I*. Although the Michigan legislature has amended the Tobacco Act since *Rising I* was decided, the relevant provisions are substantively the same. Thus, *Rising I* controls.

Here, the Community's tobacco-tax claims include: (1) preemption under the *Bracker* balancing test; (2) infringement of rights of tribal self-government and sovereign immunity; (3) preemption under the Indian Commerce Clause; (4) violations of the Interstate Commerce Clause; (5) violations of the 1842 Treaty; (6) violations of the Community's sovereign immunity; and (7) requests for preliminary and permanent injunction.

### 1. Count IX - *Bracker* balancing test

In *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980), the Supreme Court introduced a balancing test for preemption of state taxation of an activity on an Indian reservation. Under the *Bracker* test, a court must determine whether the legal incidence of a state tax falls on a nontribal entity engaged in a transaction with tribes or tribal members. *Arizona Dep't of Revenue v. Blaze Constr. Co.*, 526 U.S. 32, 37 (1999) (discussing when to apply the *Bracker* test). In *Bracker*, the Supreme Court opined that, where "a State asserts authority over the conduct of non-Indians engaging in activity on the reservation . . . we have examined the language of the relevant federal treaties and statutes in terms of both

the broad polices that underlie them and the notions of sovereignty that have developed from historical traditions of tribal independence." *Bracker*, 488 U.S. at 144-45. It requires that a court conduct "a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." *Id.* at 145.

The Community notes that it raised a *Bracker* balancing claim with respect to the January 2002 seizures in *Rising I*, but voluntarily dismissed the claim before it was litigated. (*Rising I*, No. 20:03-cv-111, ECF No. 144, PageID.1430.) In connection to other claims, the Community noted that the *Bracker* balancing analysis controlled the legality of the tax "[w]hen the legal incidence of a state tax falls upon a non-Indian for transactions within Indian country" and if the State was permitted to impose the tax under *Bracker*, that the State "may impose . . . 'minimal burdens' [on Indian retailers] . . . to collect and remit . . . taxes collected from non-Indian customers." (*Id.* at ECF No. 187, PageID.2736.)

In the Community's memorandum in support of its motion to file a second amended complaint, it explained that its amended complaint narrowed the claim to whether the refund process provided by the Michigan Department of Treasury satisfies the principles of *Moe v. Confederated Salish & Kootenai Tribes of the Flathead Reservation*, 425 U.S. 463 (1976), *Colville*, 447 U.S. at 141, *Dep't of Taxation & Finance of New York v. Milhem Attea & Bros., Inc.*, 512 U.S. 61, 64-65 (1994), and similar cases regarding minimal burdens. (*Id.* at ECF No. 144, PageID.1430.) The Court weighed the interests at stake and concluded that "there is no real dispute that the balance of interests favors the State." (*Id.* at ECF No. 300, PageID.6611.) The Court also held that the State's refund system did not impose more than minimal burdens on the tribe because the legal incidence of the tobacco tax fell on non-member

purchasers and did not present a significant interference with the Community's self-government or run afoul of any congressional enactment dealing with the affairs of Indian reservations. (*Id.* at PageID.6611; PageID.6617-18.) To reach this holding, the Court conducted "a particularized inquiry into the nature of the state, federal, and tribal interests at stake." *Bracker*, 448 U.S. at 145. But the Court did not specifically address whether *Bracker* preempted the tobacco tax. The Sixth Circuit also explained that, on appeal, the Community "[did] not appear to challenge the conclusion that the state may impose a minimal burden on the tribe in collecting taxes from non-tribal members based on the balancing of interests, but instead argue[d] that the Tobacco Act impermissibly impose[d] more than a minimal burden." *Rising I*, 477 F.3d at 890 n.3. Thus, in *Rising I*, neither this Court nor the Sixth Circuit analyzed the preemption issue.

### 2. Counts X, XI, XII - infringement of rights of tribal self-government and sovereign immunity, the Indian Commerce Clause of the United States Constitution, and the Commerce Clause of the United States Constitution

Here, the Community claims that the tobacco tax infringes on its sovereign immunity and right to self-government for both its tobacco sales in Indian country and in connection with the seizures and forfeitures used to enforce the Act. (Third Am. Compl. ¶ 151, ECF No. 58, PageID.839.) The Community also alleges that the Indian Commerce Clause preempts the Tobacco Act.

In *Rising I*, the Court explained that the Community's second amended complaint did not include its claims based on infringement of tribal self-government and the Indian Commerce Clause. (*Rising I*, No. 2:03-cv-111, ECF No. 300, PageID.6606.) Therefore, *Rising I* did not establish binding precedent on these issues because neither this Court nor the Sixth Circuit evaluated the merits of either claim.

Similarly, the Community did not raise a commerce clause claim in *Rising I*. Defendants argue that the Court determined that the tobacco products seized in transit to the reservation are immune from seizure, and that the Community could have raised and litigated a commerce clause theory. But unlike res judicata, stare decisis does not apply to issues that could have been litigated in a prior proceeding.

### 3. Count XIII - Seizures of Community's property, violations of Art. II of 1842 Treaty

This Court has already ruled that the Act "does not conflict with federal laws governing Indian trade" and that the "1842 Treaty does not limit the State's ability to impose minimal burdens on the Community to assist in the collection of the State's cigarette taxes." (*Rising I*, No. 2:03-cv-111, ECF No. 300, PageID.6620.) Taking the Community's well-pleaded factual allegations as true, the Community raises the same legal argument as in *Rising I*, which the Court has previously rejected, *id.*, and the Sixth Circuit has affirmed, *Rising I*, 477 F.3d at 893. The 1842 Treaty does not preempt the tobacco tax. Rather, the Act is consistent with federal law and the treaty provisions. Therefore, the Court will dismiss Count XIII.

### 6. Count XIV - Seizures of Community's property, violations of sovereign immunity

The Community seeks a declaration that the past seizures of its property violate its sovereign immunity. The Community raised this claim in *Rising I*, and this Court concluded that state officials may seize untaxed, unstamped tobacco products outside of Indian country and that the seizures were not barred by sovereign immunity. (*Rising I*, No. 2:03-cv-111, ECF No. 300, PageID.6629-31.)

Here, the Community alleges that the Sixth Circuit panel in *Rising I* misapplied *Colville*, 447 U.S. at 134, and *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505 (1991), to hold that the seizures did not violate the Community's sovereign immunity. (ECF No. 58,

PageID.845.) The Community urges this Court to overturn the panel decision to the extent that it might be interpreted to apply to the seizures at issue in this case. (*Id.*) But that is not the proper way to attack a prior judgment, particularly one that is binding on this Court. The Community had the opportunity to request a rehearing en banc or to petition for certiorari at the Supreme Court. *See Baltimore S.S. Co. v. Phillips*, 274 U.S. 316, 325 (1927) ("A judgment merely voidable because based upon an erroneous view of the law is not open to collateral attack, but can be corrected only by a direct review and not by brining another action upon the same cause [of action]."). *Rising I* remains good law. Taking the factual allegations as true, Defendants are also entitled to relief on this claim.

### 7. Count XVII - Preliminary and permanent injunction

A preliminary injunction requires a likelihood of success on the merits. *Am. Civil Liberties Union of Ky. v. McCreary Cty., Ky.*, 607 F.3d 439, 445 (6th Cir. 2010). Similarly, a permanent injunction requires actual success on the merits and "continuing irreparable injury for which there is no adequate remedy at law." *Id.* (citing *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 602 (6th Cir. 2006)).

Defendants argue that *Rising I* shows that the Community is not likely to succeed on the merits of the legal claims that it previously lost, and the fact that the claims were actually litigated in *Rising I* means that the Community cannot actually prevail because they are barred by res judicata. The Community argues that, because Defendants cannot show that they are entitled to judgment on the pleadings for any of its tobacco tax claims, they also are not entitled to judgment on the pleadings on the accompanying claim for injunctive relief. Because the Court has dismissed the Community's claims for Counts XIII and XIV *supra*, the accompanying claims for injunctive relief are also dismissed.

Further, *Younger* abstention requires a federal court to abstain from granting injunctive or declaratory relief that would interfere with pending state judicial proceedings. *O'Neill v. Coughlan*, 511 F.3d 638, 643 (6th Cir. 2008) (citing *Younger v. Harris*, 401 U.S. 37, 40-41 (1971)). *Younger* reflects "a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." *Id.* at 44. It "express[es] equitable principles of comity and federalism" and is "designed to allow the State an opportunity to 'set its own house in order' when the federal issue is already before a state tribunal." *Ohio Bureau of Empl. Servs. v. Hodory*, 431 U.S. 471, 479-80 (1977).

Although neither party has raised the issue of abstention, "the Supreme Court has indicated that 'abstention may be raised by the court sua sponte.'" *Federal Exp. Corp. v. Tenn. Public Service Comm'n*, 925 F.3d 962, 966 (6th Cir. 1991) (quoting *Bellotti v. Baird*, 428 U.S. 132, 143 n.10 (1976)); *see also Louisiana Power & Light v. Thibodaux*, 360 U.S. 25 (1959). A state can also waive the application of *Younger* abstention. *Sosna v. Iowa*, 419 U.S. 393, 396-97 n.3 (1975); *Hodory*, 431 U.S. at 479-80. But Defendants' failure to assert *Younger* abstention before arguing for dismissal of the claims on the merits does not constitute waiver of the right to seek dismissal of the complaint on the grounds of *Younger* abstention. *O'Neill*, 511 F.3d at 643.

The Court must look at three factors to determine whether it should "abstain from hearing a case under the *Younger* doctrine: '(1) there must be on-going state judicial proceedings; (2) those proceedings must implicate important state interests; and (3) there must be an adequate opportunity in the state proceedings to raise constitutional challenges.'" *Id.* (quoting *Sun Refining & Mktg. Co v. Brennan*, 921

F.2d 635, 639 (6th Cir. 1990)).

Although a court may issue an injunction against the enforcement of certain state criminal statutes, *Dombrowski v. Pfister*, 380 U.S. 479 (1965), the Community's complaint does not allege substantial allegations of bad faith or harassment. Likewise, the complaint's allegations do not "depict a situation in which defense of the State's criminal prosecution will not assure adequate vindication of constitutional rights." *Id.* at 485-86. Thus, without allegations of bad faith or harassment, the Court will abstain from issuing declaratory or injunctive relief against the enforcement of criminal liability for violations of the Tobacco Act.

**D. The Court cannot properly determine whether Defendants are entitled to qualified immunity at this stage**

Qualified immunity is an affirmative defense that extends to government officials performing discretionary functions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982). Government officials acting within the scope of their authority are entitled to qualified immunity as long as their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818. It protects "all but the plainly incompetent or those who knowingly violate the law." *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007).

The Sixth Circuit applies a two-part test to determine whether a government official is entitled to the defense of qualified immunity: (1) whether the plaintiff has shown a violation of a constitutionally-protected right; and, if so, (2) whether that right was clearly established such that a reasonable official would have understood that his behavior violated that right. *Shehee v. Luttrell*, 199 F.3d 295, 299-300 (6th Cir. 1999). The purpose of the clearly-established prong is to ensure that officials are on notice that

their alleged conduct was unconstitutional. *Baynes v. Cleveland*, 799 F.3d 600, 610 (6th Cir. 2015) (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). The salient question is "'whether the state of the law [at the time of the action giving rise to the claim] gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional.'" *Id.* (quoting *Hope*, 536 U.S. at 741). In other words, "in the light of pre-existing law the unlawfulness must be apparent." *Hope*, 536 U.S. at 739 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

After a defendant raises a qualified-immunity defense, the burden shifts to the plaintiff to demonstrate that the government official violated a right that was so clearly established "that every 'reasonable official would have understood that was he [was] doing violate[d] that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson*, 483 U.S. at 640). At a minimum, to survive a motion to dismiss on qualified-immunity grounds, a plaintiff "must allege facts that 'plausibly mak[e] out a claim that the defendant's conduct violated a constitutional right that was clearly established at the time, such that a reasonable officer would have known that his conduct violated that right." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016). "Although an officer's entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." *Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015); *see also Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Village Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring) (observing that the fact-intensive nature of qualified immunity makes it "difficult for a defendant to claim qualified immunity on the pleadings *before discovery*" (emphasis in original)). Given the fact-intensive nature of the qualified-immunity analysis here, the Court cannot conduct such analysis prior to the start of discovery.

**IV.**

In sum, the doctrines of res judicata and collateral estoppel do not preclude the Community's

claims. However, applying stare decisis, the Court will dismiss Counts XIII and XIV and the

accompanying requests for declaratory or injunctive relief because, taking the factual allegations in the

complaint as true, *Rising I* controls and Defendants are clearly entitled to relief.

An order will enter in accordance with this opinion.

DATE: June 30, 2017                                    /s/ Paul L. Maloney
                                                       Paul L. Maloney
                                                       United States District Court Judge