UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KEWEENAW BAY INDIAN COMMUNITY, )
                       Plaintiff, )
                               )      No. 2:16-cv-121
-v- )
                               )      Honorable Paul L. Maloney
NICK A. KHOURI, *et al.*, )
                     Defendants. )
_____)

## OPINION AND ORDER RESOLVING CROSS MOTIONS FOR PARTIAL SUMMARY JUDGMENT

Michigan collects sales taxes, use taxes, and tobacco taxes from transactions involving members of the Keweenaw Bay Indian Community and Keweenaw Bay Indian Community itself. Unlike many other federally recognized Indian tribes in Michigan, Keweenaw Bay Indian Community (KBIC) has not negotiated a tax agreement with Michigan. As a result, Michigan requires KBIC and its members to submit forms requesting exemptions and refunds from the various state taxes. In 2012, KBIC and four of its members began submitting sales and use tax claims to the State. Sometimes, Michigan grants the requested refunds. For example, Michigan granted a refund for the taxes imposed on the purchase of building materials by KBIC's public works department that were used for the construction of a transfer station. (ECF No. 155-23.) Other times, Michigan denied the request for a tax refund, including when the casino requested a refund on the tax paid for the delivery of thirty-four pizzas. (ECF No. 155-8.)

Using the results of the requested refunds as exemplary claims, KBIC filed this lawsuit, its third, seeking declaratory and injunctive relief and damages. KBIC contends the

enforcement and collection of state taxes violates federal law.  KBIC also seeks monetary damages under § 1983.

In its third amended complaint, KBIC asserts sixteen causes of action.[1]  Two the claims, Counts 13 and 14, have already been dismissed.  (ECF No. 82.)  The parties filed three dispositive motions which are addressed in this Opinion and Order.[2]  KBIC filed a motion for partial summary judgment.  (ECF No. 125.)  Defendants filed a motion for summary judgment.  (ECF No. 316.)  KBIC then filed a second motion for partial summary judgment.[3]  (ECF No. 327.)  The Court held a hearing on the three motions.  (ECF No. 405.)

The Court will grant in part and deny in part the motions for partial summary judgment.  Because Michigan does not permit apportionment of its use tax, the Court will grant KBIC summary judgment on Count 5.  For all other counts and claims, the Court will grant summary judgment to Defendants.

## I.

KBIC has filed multiple lawsuits challenging Michigan's taxes.  A brief history provides some context for this third action.

KBIC is a federally recognized Indian tribe and is the successor in interest to the L'Anse and Ontonagon bands of Chippewa Indians.  *Keweenaw Bay Indian Cmty. v. Rising*, 569 F.3d 589, 591 (6th Cir. 2009) (*Rising II*).  KBIC "exercises powers of self-governance

---

[1]        Counts 17 and 18 are not causes of action; the two counts are prayers for relief.  In Count 17, KBIC request declaratory and injunctive relief.  In Count 18, KBIC requests costs and attorney fees.
[2]        Defendants Grano and Sproull also filed a motion for summary judgment concerning pending state court criminal actions.  (ECF No. 98.)
[3]        Plaintiff filed two briefs in support, ECF No. 328 and ECF No. 364.  The later filed brief replaced the earlier filed brief.

and sovereign jurisdiction over the L'Anse Indian Reservation in the Upper Peninsula of Michigan, as well as over extensive lands held in trust by the United States outside of the reservation in the western half of the Upper Peninsula."[4] *Id.* In 1977, Michigan and KBIC entered into a comprehensive tax agreement for the assessment and collection of state taxes involving the Tribe and its members. *Id.* In 1997, Michigan terminated its tax agreements with the twelve federally recognized Tribes in Michigan as part of an effort to obtain uniformity in the agreements. *Id.* While Michigan has reached new agreements with most of the Tribes, Michigan and KBIC have not reached a new agreement.[5] *Id.* As a result, KBIC and its members must request exemptions and refunds from state taxes on a transaction-by-transaction basis. *Id.*

In 2003, KBIC filed a lawsuit to enjoin Michigan from collecting state taxes on cigarettes sold by KBIC at its gaming facilities. *Keweenaw Bay Indian Cmty.*, No. 2:03-cv-111 (W.D. Mich.) Michigan collects taxes on cigarettes before a retail sale by requiring tobacco products to bear a stamp indicating the tax has been paid. KBIC challenged the prepayment of taxes, asserting that the process imposed too much of a burden. Judge Robert Bell upheld Michigan's system for refunding cigarette taxes to retail sellers located on Indian country for sales to KBIC and its members. *Id.*, 2005 WL 2207224 at *10 (W.D. Mich. Sept. 12, 2005). Judge Bell also held that Article II of the 1842 Treaty did not prohibit

---

[4] In one of its briefs, Defendants identify a dispute about the scope of the reservation land in Baraga County. (ECF No. 365 Def. Resp. at 5 n.1 PageID.5314.) KBIC has not alleged any claims about the size, scope, or placement of its lands. To the extent any factual dispute exists on this point, the dispute is not material to the claims presented in the complaint and the motions.

[5] Between 2003 and 2011, Michigan entered into tax agreements with ten Tribes. (ECF No. 152-2 Fratzke Dec. ¶ 12 PageID.2144.)

Michigan from collecting taxes on cigarettes sold by KBIC to non-Indians.  *Id.* at *11.  The Sixth Circuit upheld both of these findings.  *Keweenaw Bay Indian Cmty. v. Rising*, 477 F.3d 881, 892-93 (6th Cir. 2007) (*Rising I*).

In 2005, KBIC filed a lawsuit to enjoin Michigan from collecting both sales taxes and use taxes on its members.  *Keweenaw Bay Indian Cmty. v. Kleine*, No. 2:05-cv-224 (W.D. Mich.)  Judge Gordon Quist held that KBIC had standing to challenge the enforcement of the sales and use taxes as a violation of federal law.  *Id.*, 546 F.Supp.2d 509, 520-21 (W.D. Mich. 2008).  Judge Quist explained that the enforcement scheme for the sales and use taxes was similar to the enforcement scheme for cigarette taxes in *Rising I*, but less burdensome because KBIC and its members were not required to prepay the taxes.  *Id.* at 525. Ultimately, Judge Quist held that KBIC's challenge to the sales and use tax enforcement scheme was not ripe because the parties had not presented specific factual situations where either KBIC or one of its members sought and was denied a tax exemption.  *Id.* at 526.  The Sixth Circuit agreed that KBIC's tax-related claims should be dismissed as unripe.  *Rising II*, 569 F.3d at 594.

Following *Rising II*, Michigan created two forms that non-agreement tribes and their members must use when seeking an exemption or a refund.[6]  Form 4765 is used by individual members of a Tribe for their own transactions.  (ECF No. 128-2 PageID.1684.)  Form 4766 is used by federally recognized tribes for its transactions.  (ECF No. 128-3 PageID.1687.)  By

---

[6]        KBIC and its members do not need to use these particular forms for generally applicable tax exemptions.  (ECF No. 15202 Fratzke Dec. ¶ 21 PageID.2146.)  The Court infers that the form is used only for tax exemptions that are unique to Indian tribes and their members.

completing either form and submitting it to the Michigan Department of Treasury, KBIC and its members may seek a determination in advance whether a particular transaction is subject to taxation.  (ECF No. 58 Third Amended Complaint "Compl." ¶ 41 PageID.803.) Without an advanced determination, the purchaser must pay any tax at the time of the transaction and then submit a completed form to request a refund of the sales or use tax paid.  (*Id.*)

KBIC and four of its members have since filed request for exemptions and refunds in an effort to create the record for this lawsuit.  KBIC itself submitted request forms using the process established by Michigan.  Between January 2013 and February 2017, KBIC submitted approximately 991 claims for exemptions or refunds.  (Compl. ¶ 44 PageID.804.) The claims related to purchases of a variety of tangible personal property (*e.g.*, motor vehicles, office furniture, linens, uniforms, and housekeeping items) and for various services (*e.g.*, telephone and telecommunication services).  (*Id.*)  Of the 991 claims, 33 had not been ruled upon when the complaint was filed.  (*Id.*)  Michigan granted only 58 and denied the other 900 claims.  (*Id.*)

Four members of KBIC also submitted forms following the process.   Between January 2012 and February 2017, the four members submitted approximately 254 claims for exemption or refund.  (Compl. ¶ 45 PageID.804.)  The members sought exemptions and refunds for transactions involving a variety of tangible personal property and services.  (*Id.* PageID.805.)  Of the 254 claims, KBIC has no records indicating what decision was made concerning 25 of the claims.  (*Id.*)  Michigan granted 68 claims and denied 161 claims.  (*Id.*)

The parties have each submitted their own summary tables for the refund and exemption claims.  The parties have also submitted declarations in which the declarants describe the process and offer some explanations about the information the tables.  (ECF No. 128 Nichols Dec. (Plaintiff) PageID.1642; ECF No. 152-2 Fratzke Dec. (Defendants) PageID.2141; ECF No. 152-9 Thelen Dec. (Defendants) PageID.2176.)  KBIC filed a single comprehensive table identifying 1339 claims that were submitted between July 2012 and August 2017.  (ECF No. 128-1 KBIC Summary Chart PageID.1649-82.)  Defendants filed three documents. Defendants filed a similar comprehensive table identifying 1345 claims that were submitted between May 2012 and September 2017.[7]  (ECF No. 152-10 PageID.2190-2230.)  Defendants filed a table summarizing information about the claims and results identified in the first table.  (ECF No.  152-11 PageID.2232-36.)  The third table provides the same summary information as the second table, but only for claims submitted between January 1, 2014, and September 5, 2017.  (ECF No. 152-12 PageID.2238-41.)  Defendants insist that Plaintiff's table "does not fully or accurately account for the claims or how Treasury decided them."  (ECF No. 152 at 8 PageID.2104.)  Thelen explains why Defendants submitted a second summary table: (1) most of the claims were submitted after 2013 and (2) a delay occurred in 2013 in the computer systems for refunds and checks. (ECF No. 152-9 ¶ 43 PageID.2187.)  Other than KBIC's claims for damages in Counts 13 15 and 16, any differences between the two comprehensive tables are not material differences that affect the cross motions for summary judgment.

---

[7]        The chart includes two claims submitted on May 4, 2012.  All other claims were submitted between July 2012 and August 2017.

According to Defendants, each claim for an exemption or a refund receives an individual review and determination. (*See* ECF No. 15-2 Fratzke Dec. ¶ 4.c. PageID.2142 and ¶¶ 34-40 PageID.2149-50; ECF No. 152-9 Thelen Dec. ¶¶ 8 and 9 PageID.2178.) Generally, Michigan responds to each request for an exemption or refund with one of four options: (1) issue a letter denying the refund or exemption; (2) issue a check or warrant when the refund is approved; (3) issue an exemption letter when an exemption is approved; or (4) issue a letter requesting more information or documentation from the filer. (ECF No. 152-2 Fratzke Dec. ¶ 38 PageID.2150, ¶ 43 PageID.2151, and ¶ 47 PageID.2151; ECF No. 152-9 Thelen Dec. ¶ 10 PageID.2178.)

## II.

The legal standard for evaluating a motion for summary judgment is familiar and well established. A trial court should grant a motion for summary judgment only in the absence of a genuine dispute of any material fact and when the moving party establishes it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that no genuine issues of material fact exist. *Celotex Crop. v. Catrett*, 477 U.S. 317, 324 (1986). To meet this burden, the moving party must identify those portions of the pleadings, depositions, answers to interrogatories, admissions, any affidavits, and other evidence in the record, which demonstrate the lack of genuine issue of material fact. Fed. R. Civ. P. 56(c)(1); *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018). The moving party may also meet its burden by showing the absence of evidence to support an essential element of the nonmoving party's claim. *Holis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 543 (6th Cir. 2014). When faced with a motion for

summary judgment, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Pittman*, 901 F.3d at 628 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).  The court must view the facts and draw all reasonable inferences from those facts in the light most favorable to the nonmoving party.  *Maben v. Thelen*, 887 F.3d 252, 263 (6th Cir. 2018) (citing *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In resolving a motion for summary judgment, the court does not weigh the evidence and determine the truth of the matter; the court determines only if there exists a genuine issue for trial.  *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson*, 477 U.S. at 249).  The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-252.

When one party moves for summary judgment, and the facts and the law clearly establish that the other party is entitled to summary judgment on the issue, a district court may enter summary judgment on the issue.  *See Wilson v. Cont'l Dev. Co.*, 112 F.Supp.2d 648, 663 (W.D. Mich. 1999); *Eckford-El v. Toombs*, 760 F.Supp. 1267, 1272 (W.D. Mich. 1991); *see also Salens v. Tubbs*, 292 F. App'x 438, 441 (6th Cir. 2008) ("As we have said, granting summary judgment 'in favor of an opposing party when one party has made a motion for summary judgment . . . may not be as detrimental since the moving party is at least aware that the issue has been raised.'" (quoting *Employers Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 105 (6th Cir. 1995)).

III.

A brief summary of Michigan's tax statutes provides necessary background.

A.  Sales Tax

The Michigan Legislature enacted a retail sales tax, the General Sales Tax Act, §§ 205.51, *et seq.* (GSTA).  The GSTA provides that the tax will be collected annually from the seller, and that the tax will be calculated on six percent of the gross proceeds of the business.

> Except as provided in section 2a, there is levied upon and there shall be collected from all persons engaged in the business of making sales at retail, by which ownership of tangible personal property is transferred for consideration, an annual tax for the privilege of engaging in that business equal to 6% of the gross proceeds of the business, plus the penalty and interest if applicable as provided by law, less deductions allowed by this act.

Mich. Comp. Laws § 205.52(1).  The "legal responsibility" for the sales tax falls on the retail seller, who is responsible for remitting the tax to the state government.  *Andrie Inc. v. Treasury Dep't.*, 853 N.W.2d 310, 314 (Mich. 2014).  The GSTA "does not prohibit" the seller from reimbursing itself "by adding to the sale price any tax levied by this act."  Mich. Comp. Laws § 205.73(1).

In 2004, as an amendment to the GSTA, the Michigan Legislature passed into law certain provisions that allowed Michigan to participate in the Streamlined Sales Tax Project. Among the additions, the GSTA now includes guidelines for identifying where a retail sale occurs.

> (1) For sourcing a sale at retail for taxation under this act, the following apply:
> (a) If a product is received by the purchaser at a business location of the seller, the sale is sourced to that business location.
> (b) If a product is not received by a purchaser at a business location of the seller, the sale is sourced to the location where the product is received by the purchaser or the purchaser's designee, including the location indicated by instructions for delivery to the purchaser, known to the seller.

Mich. Comp. Laws § 205.69(1).

## B.  Use Tax

The Michigan Legislature also enacted a use tax, the Use Tax Act, §§ 205.91, *et seq.* (UTA).  The UTA provides that the tax will be collected from individuals who use tangible personal property in the State at a rate of six percent of the price of the property or services.

> There is levied upon and there shall be collected from every person in this state a specific tax, including both the local community stabilization share and the state share, for the privilege of using, storing, or consuming tangible personal property in this state at a total combined rate equal to 6% of the price of the property or services specified in section 3a or 3b.  . . .

Mich. Comp. Laws § 205.93(a).  The statute does not permit apportionment of the use tax to distinguish between use of the tangible property in Indian country and use of the property in Michigan but outside of Indian country.

> The tax levied under this act applies to a person who acquires the tangible personal property or services that are subject to the tax levied under this act for any tax-exempt use who subsequently converts the tangible personal property or service to a taxable use, including an interim taxable use.  If tangible personal property or services are converted to a taxable use, the tax levied under this act shall be imposed without regard to any subsequent tax-exempt use.

*Id.*  The "legal responsibility" for the use tax "falls solely on the consumer."  *Andrie Inc.*, 853 N.W.2d at 314.  "[S]ellers with sufficient connection to Michigan are required to collect the tax and remit it to the Department of Treasury."  *World Book, Inc. v. Dep't of Treas.*, 590 N.W.2d 293, 296 (Mich. 1999) (citing Mich. Comp. Laws § 205.95). The UTA contains a subsection that addresses taxes on personal property purchased for lease purposes.

> A lessor may elect to pay use tax on receipts from the rental or lease of the tangible personal property in lieu of payment of sales or use tax on the full cost of the property at the time it is acquired. . . .

Mich. Comp. Laws § 205.95(4).

The GSTA and the UTA are "complementary" such that property for which the use tax is paid is not subject to the sales tax and property on which sales tax is paid is not subject to the use tax. *World Book*, 590 N.W.2d at 296. A taxpayer asserting an exemption from Michigan's use tax must establish that sales tax was both due and paid on the retail sale of the property. *Andrie Inc.*, 853 N.W.2d at 315. And, the taxpayer must prove that the sales tax was paid to the retail seller or that the retail seller remitted the sales tax to the State; no presumption arises that a taxpayer paid the sales tax at the point of sale. *Id.* at 316.

## C. Tobacco Tax

Michigan's Tobacco Products Tax Act (TPTA), Mich. Comp. Laws § 205.421, *et al.*, imposes an excise tax on the sale of tobacco products. The TPTA also "requires those who manufacture, transport and sell tobacco products to obtain a license to 'purchase, possess, acquire for resale, or sell a tobacco product.'" *Rising I*, 477 F.3d at 883 (quoting Mich. Comp. Laws § 205.423(1)). The legal incidence of the tax on tobacco products falls on the consumer. *See id.* at 890. ("For these reasons, we affirm the district court's conclusion that the legal incidence of the tax falls on the non-tribal consumers and not on the Community."). In *Rising I*, the Sixth Circuit stated that Michigan cannot tax cigarettes sold on the reservation to tribal members for their own use, but Michigan "can tax sales made by a tribe to individuals who are not tribal members." *Id.* at 883.

## IV.

The tax disputes between KBIC and Michigan are not unique or novel. As sovereign nations, Indian tribes have long resisted paying state taxes. When considering KBIC's

claims, this Court must keep in mind the guidelines outlined by the United States Supreme Court.

### A.  State Taxation of Indians - Who and Where Factors

The United States Supreme Court has had multiple opportunities to consider a state's attempt to tax Indian tribes and their members as well as non-Indians doing business with Indians or doing business on Indian lands.  Early on, the Supreme Court warned that "[g]eneralizations on this subject have become particularly treacherous." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148 (1973).  A state's ability to exercise authority over Indian tribes and tribal members is constrained by "two independent but related barriers," federal preemption and tribal sovereignty.  *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142 (1980).  First, dating back to 1790, Congress enacted statutes, the Indian Trader statutes, that have "comprehensively regulated trade with Indians to prevent 'fraud and imposition' upon them." *Cent. Mach. Co. v. Arizona State Tax Comm'n*, 448 U.S. 160, 163 (1980). Second, because Indian tribes exercise some sovereignty within their territory, "there is no rigid rule by which to resolve the question whether a particular state law may be applied to an Indian reservation or to tribal members." *Bracker*, 448 U.S. at 142.

Through the years, the Supreme Court has offered some guidance on the relationship between state tax authority and tribal sovereignty.  For "Indian tax immunity cases, the 'who' and the 'where' of the challenged tax have significant consequences." *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 101 (2005).  Although *Wagnon* is a relatively recent opinion, looking historically at Supreme Court opinions, the who and where considerations factored prominently in the outcomes.

### 1. "Where" Factor

In 1973, the Supreme Court issued companion opinions illuminating the importance of the "where" factor. Both cases involved a state's attempt to tax Indian tribes and their members. The two cases indicated that a state's tax authority over Indians is greater off reservations and is very limited on reservations. In one case, New Mexico tried to collect a sales tax and a use tax related to a ski resort operated by the Mescalero Apache Tribe on land outside the tribal reservation. *Mescalero Apache Tribe*, 411 U.S. at 146. In the other case, Arizona tried to impose personal income taxes on tribal members whose income derived entirely from reservation sources. *McClanahan v. State Tax Comm'n of Arizona*, 411 U.S. 164, 165 (1973).

*McClanahan* establishes that "state law is generally inapplicable" for "on-reservation conduct involving only Indians." *Bracker*, 448 U.S. at 144. *McClanahan* was resolved against the backdrop of the well-settled doctrine of Indian sovereignty. *McClanahan*, 411 U.S. at 172. McClanahan was a member of the Navajo tribe and she lived on the Navaho reservation located in Arizona. *Id.* at 165. The Navajo Treaty had been consistently interpreted as establishing the exclusive sovereignty of the Navajos under federal supervision. *Id.* at 175. And, a condition of Arizona's entry into the Union was that the state disclaimed rights and titles to lands owned or held by Indians and Indian tribes. *Id.* "Since appellant is an Indian and since her income is derived wholly from reservation sources, her activity is totally within the sphere of the relevant treaty and statutes leave for the Federal Government and for the Indians themselves." *Id.* at 179-80.

A different outcome occurred in *Mescalero Apache Tribe.* The dispute concerned a ski area that was developed under the Indian Reorganization Act and the money for the project was a loan from the federal government under the Act. *Mescalero Apache Tribe*, 411 U.S. at 146. The ski area, however, was located off of the reservation. The Court observed that "[a]bsent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Id.* at 148-49. The Court considered that the Indian Reorganization Act did explicitly exclude from state taxation those lands taken or acquired under the Act. *Id.* at 155. The Court then distinguished the land itself from income derived from the land, the former being tax exempt while the latter was not. *Id.* at 155-56. The Court held that Arizona could levy a sales tax on the applicable business activities at the ski resort. *Id.* at 157-58. The use tax, however, could not be levied. *Id.* at 158-59. Permanent improvements to the Tribe's tax-exempt land were immune from Arizona's property taxes. *Id.* at 158. Arizona was levying the use tax on "personalty installed in the construction of the ski lifts" and the parties had stipulated that the personal property had been permanently attached to the land. *Id.* The Court reasoned that if Arizona could not levy property taxes the land or its permanent attachments, it also could not levy taxes on the use of that land and permanent attachments because "use is a tax upon the property itself." *Id.*

## 2. "Who" Factor

For the "who" factor, courts should consider "who bears the legal incidence of a tax," a fact that is "frequently dispositive" in Indian tax cases. *Oklahoma Tax Comm'n v. Chickashaw Nation*, 515 U.S. 450, 457 (1995). The party on whom the tax is levied, the

party responsible for paying the tax, typically bears the legal incidence of the tax.  The test imposes a "reasonably bright-line standard, from a tax administration perspective." *Id.* at 460. The Supreme Court rejected an "economic realities" test as unworkable. *Id.* at 459.  When the legal incidence of a tax falls on non-Indians, no categorical bar prevents enforcement of the tax and courts balance the state, federal and tribal interests. *Id.* at 459; *see Bracker*, 448 U.S. at 145 (holding that where a state asserts authority over non-Indians engaging in activity in a reservation, courts must perform a "particularized inquiry into the nature of the state, federal and tribal interests at stake.").  However, when the legal incidence of the tax falls on an Indian tribe or its members for activities within Indian lands, the tax cannot be enforced without a clear signal from Congress. *Id.*  A state may include "dispositive language" in its statute which affixes the legal incidence of a tax on one of the parties to the transaction. *Id.* at 461.  Sometimes, a state's statute does not clearly identify the entity bearing the legal incidence of a tax.  The Supreme Court has clarified that the legal incidence test is "nothing more than a fair interpretation of the taxing statute as written and applied, without any requirement that pass-through provisions or collection requirements be 'explicitly stated.'" *California State Bd. of Equalization v. Chemehuevi Indian Tribe*, 474 U.S. 9, 11 (1985).

Wagnon and *Chickshaw Nation* illustrate the different outcomes based on who bears the legal incidence of a state-imposed tax.  In *Chickashaw Nation*, Oklahoma imposed a tax on fuel sold by the Chickashaw Nation tribe. *Chickashaw Nation*, 515 U.S. at 457.  The legislation required fuel distributors, on behalf of the licensed retailer, to remit the taxes due to the State's Tax Commission. *Id.* at 461.  After considering other provisions within the statute, the Court held that the tax was imposed on the retailer, not the distributor. *Id.* at

461-62.  Because Oklahoma was levying a tax on the fuel sold by the Tribe in Indian country, the excise tax was unenforceable.[8]  *Id.* at 453.

In *Wagnon*, Kansas imposed a tax on the initial receipt of motor fuel by fuel distributors.  *Wagnon*, 546 U.S. at 99.  The non-Indian fuel distributors subsequently delivered fuel to gas stations owned by an Indian tribe and located on the tribe's reservation.  *Id.*  The state statute specified that "the incidence of this tax is imposed on the distributor of the first receipt of the motor fuel."  *Id.* at 102 (quoting Kan. Stat. Ann. § 79-3408(c)).  Fuel distributors passed along the cost of the tax to their customers, including the Tribe.  *Id.* at 99-100.  The Supreme Court held that the tax was a valid exercise of state authority.  *Id.* at 115.

## B.  *Bracker* Balancing

For situations involving a State's authority over the conduct of non-Indians engaging in activity on Indian land, the Supreme Court requires a court to balance competing state, federal and tribal interests.  *Bracker*, 448 U.S. at 144-45; *see Ramah Navajo School Bd., Inc. v. Bureau of Revenue of New Mexico*, 458 U.S. 832, 838 (1982).  Weighing these factors, a court must decide if federal interests preempt state interests or whether a state can advance its interests consistent with federal interests.[9]

---

[8]    The majority was careful to note that the tax "as currently designed" was unenforceable.  *Id.* at 453.  Later in the opinion, the majority commented that Oklahoma could have amended the law to shift the legal incidence of the tax to consumers, rather than the retailers.  *Id.* at 460.

[9]    The Court uses the term "federal interests" broadly to include tribal interests.  As *Bracker* explains, federal interests and tribal interests can independently provide a sufficient basis for preempting the state's law, but federal and tribal interests are interdependent because a tribe's right to self-government depends upon and is subject to federal legislation.  *Bracker*, 448 U.S at 143.

*Bracker* and *Ramah* illustrate how comprehensive federal legislation can preempt a state's attempt to tax activities by non-Indians on Indian land.  *Bracker* involved state taxes imposed on a non-Indian logging company working a reservation.  The Court began by identifying the economic interests of the Apache Tribe and the federal statutes and regulations relevant to the commercial operation giving rise to the dispute.  Over ninety percent of the Tribe's annual profits came from its timber operations.  *Bracker*, 448 U.S. at 138.  Under federal law, the timber on the reservation is owned by the United States for the benefit of the Tribe and the timber could not be harvested without permission from Congress.  *Id.*  The Secretary of the Interior authorized the formation of the Fort Apache Timber Company (FATCO), which was a tribal company for managing and selling timber. *Id.* at 139.  The United States contracted with FATCO to harvest timber and FATCO, in turn, contracted with logging companies, including non-Indian companies.  *Id.*

Arizona levied taxes on a non-Indian logging company, which were paid under protest.  One tax was a motor carrier license tax based on a percentage of the carrier's gross receipts.  *Bracker*, 448 U.S. at 139.  Arizona also collected a fuel tax which was levied for the purpose of compensating Arizona for the use of its roads.  *Id.* at 139-40.  For the litigation, the parties conceded the carrier's tax liability associated with travel on the State's roads in the reservation.  *Id.* at 140 n.6.

To resolve the dispute, the Court identified several factors that had to be considered when states attempt to tax non-Indians for conduct occurring on Indian land.

> In such cases we have examined the language of the relevant federal treaties and statutes in terms of both the broad policies that underlie them and the notions of sovereignty that have developed from historical traditions of tribal

> independence. This inquiry is not dependent on mechanical or absolute conceptions of state or tribal sovereignty, but has called for a *particularized inquiry* into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the *specific context*, the exercise of state authority would violate federal law.

*Bracker*, 448 U.S. at 145 (emphasis added). Thus, the independent but related concepts of tribal sovereignty and federal supremacy, *id.* at 143, must be weighed against any regulatory interest of the State, *id.* at 144. The Court concluded the relevant factors overwhelming favored federal preemption: the federal regulation of harvesting Indian timber was comprehensive through federal statutes, detailed regulations promulgated by the Secretary of the Interior, and day-to-day supervision by the Bureau of Indian Affairs. *Id.* at 145-48. In addition to interfering with federal regulatory schemes, Arizona could not identify any regulatory function or service it provided that would justify levying taxes for use of the Bureau's and the Tribe's roads. *Id.* at 148-49. The Court also found that the taxes threatened the Tribal profits derived from the timber sales. *Id.* at 149. The United States has a general policy of encouraging tribal self-governance and control over their business and economic affairs. *Id.*

These same concerns required the same outcome in *Ramah.* Instead of timber sales, that case involved the construction of a school. The Ramah Navajo Chapter formed a school board and, with funds provided by the Bureau of Indian Affairs, it operated an independent school for the benefit of Navajo children. *Ramah Navajo Sch. Bd.*, 458 U.S. at 834. The Board later solicited funds from Congress for construction of a new building and contracted with the BIA for the design of the school. *Id.* at 835. The Board hired sub-contractors,

including a non-Indian sub-contractor.  When New Mexico collected taxes from the sub-contractor, which were passed to the Board, the Board sued.

The Court found the facts "indistinguishable in all relevant aspects from [*Bracker*]. *Ramah Navajo Sch. Bd.*, 458 U.S. at 839.  "Federal regulation of the construction and financing of Indian educational institutions is both comprehensive and pervasive." *Id.* After summarizing the balancing scheme from *Bracker*, the Court noted that the preemption analysis was not controlled by standards in other preemption situations. *Id.* at 838.  "Instead, the traditional notions of tribal sovereignty, and the recognition and encouragement of this sovereignty is congressional Acts promoting tribal independence and economic development, inform the pre-emption analysis that governs this inquiry." *Id.* And, Congress need not have explicitly announced an intention to pre-empt state activity. *Id.*

In contrast to *Bracker* and *Ramah*, in *Cotton Petroleum Corporation v. New Mexico*, 490 U.S. 163 (1989), the Supreme Court held that federal and tribal interests did not preempt New Mexico's severance tax on the production of oil and gas by a non-Indian company on leases within a tribe's reservation.  The leases were located on land owned by the United States and held in trust for the Jacarilla Apache Tribe. *Id.* at 166.  The Tribe leased the land to non-Indian companies for oil and gas production. *Id.* at 167.  The Secretary of the Interior authorized the Tribe to impose taxes on non-members doing business on the reservation. *Id.*  The Tribe levied both a severance tax and a privilege tax, both of which were authorized by the Secretary. *Id.* at 167-68.  New Mexico also levied multiple taxes on the production of oil and gas within the state. *Id.* at 168.

Cotton Petroleum challenged New Mexico's taxes relevant to the oil and gas leases on the reservation.  The Court conducted a *Bracker* balancing analysis.  *Cotton Petroleum*, 490 U.S. at 176-87.  Beginning with federal interest, the Court found that the 1938 Indian Mineral Leasing Act did not preclude state taxation, even if the purpose of the 1938 Act was to provide Indian tribes with needed revenue.  *Id.* at 180.  The Court found no history or tradition of tribal independence from state taxation under which oil and gas lessees could find immunity.  *Id.* at 182.  Finally, the Court found that New Mexico provided substantial services to both the Jicarilla Tribe and to Cotton Petroleum and also regulated the spacing and integrity of Cotton Petroleum's wells.  *Id.* at 185.  Balancing these interests, the Court held that federal law did not preempt New Mexico's oil and gas severance taxes.  *Id.* at 186-87.

## V.

With this background and context, the Court considers the cross motions for partial summary judgment.

### A.  Count 1 - Sales Tax - *Per Se* Rule[10]

In Count 1, KBIC alleges that Michigan's sale tax, as applied to KBIC and its members for products and services used exclusively within their Indian country, is *per se* unconstitutional.  Specifically, KBIC contends that Michigan cannot collect a sales tax on a transaction (purchase, lease, or rental of personal tangible property) between a non-Indian retailer and an Indian when the personal tangible property is used exclusively in Indian

---

[10]      Plaintiff's first motion for partial summary judgment.  (ECF No. 126 Pl. Br. at 23-27 PageID.1622-26.)

country.  KBIC succinctly summarizes its reasoning: "For purposes of applying this federal immunity, vendors making sales to Indians within their Indian country qualify as Indian traders regardless of whether the vendors have Indian trader licenses or places of business within Indian country."  (ECF No. 126 at 23 PageID.1622.)  KBIC generally relies on *Warren Trading Post v. Arizona Tax Commission*, 380 U.S. 685 (1965), *Central Machinery Company v. Arizona State Tax Commission*, 448 U.S. 160 (1980) and *Department of Taxation v. Milhelm Attea & Brothers, Inc.*, 512 U.S. 51 (1994).

KBIC contends that the Supreme Court applies a *per se* rule.  Defendants disagree. Both parties' approach this claim as a question of law.  They generally agree that no material facts are in dispute.  For this claim, the transaction occurs between an Indian and a non-Indian trader and the goods or services are used entirely in KBIC's Indian country.  None of the claims involve KBIC or one of its members acting as a retailer.  (ECF No. 152-2 Fratzke Dec. ¶ 52 PageID.2152; ECF No. 152-9 Thelen Dec. ¶ 23 PageID.2181.)  And, none of the sales tax claims involve a retailer licensed under the Indian Trader Statutes or a purchase financed or approved by the Bureau of Indian Affairs.  (ECF No. 152-2 Fratzke Dec. ¶ 53 PageID.2153.)  Plaintiffs have not argued or presented evidence otherwise.[11]

For this lawsuit, the Court assumes all of the transactions occurred within KBIC's Indian country.  KBIC argues that all of its exemplar claims "involve purchases and use within the Reservation, based on established Michigan rules for determining the location of

---

[11]    In the Complaint, KBIC alleges that, in some cases, the retail sellers are also members of KBIC.  (Compl. ¶ 110 PageID.822.)  The Court has not identified any evidence in the record to support this allegation.

a transaction for tax purposes[.]"  (ECF No. 126 at 11 PageID.1610.)  KBIC submitted four declarations from tribal members, all of which contain the exact same language.  In relevant part, each individual states "[t]he exemplar claims that I submitted do not represent all instances in which I was required to pay sales or use tax with respect to a transaction that took place in the Community's Indian country or property stored in the Community's Indian country."  (ECF No. 131 E. Mayo Dec. ¶ 4 PageID.2032; ECF No. 132 S. Mayo Dec. ¶ 4 PageID.2036; ECF No. 133 S. LaFernier Dec. ¶ 4 PageID.2040; ECF No. 134 M. LaFernier Dec. ¶ 4 PageID.2044.)  The Court notes that the form requests information that would assist Michigan in determining where a transaction occurred: the location of solicitation, payment, the signing of any contract, and where the exchange of possession occurred.  (ECF No. 128-2 PageID.1684.)  For most or all of the claim forms in the record, KBIC and its members indicated that the solicitation, payment, and exchange of possession occurred on the Tribes' reservation.[12]  In the denial letters for many of these claims, Michigan wrote, in part, that the information provided indicates that some or all of the transactions occurred with the Tribe's Indian country or it is unclear and, therefore, Michigan used the *Bracker* balancing test.[13]  Defendants do not assert any factual dispute concerning the location of the transactions.

*Warren Trading* and *Central Machinery* involved an Arizona sales tax, while *Milhelm Attea* involved cigarette taxes.  In 1965, in *Warren Trading*, the Supreme Court held that

---

[12]     *E.g.*, ECF No. 129-2 claim form for natural gas purchase from SEMCO PageID.1788; ECF No. 129-3 claim form for paint and supplies from Sherman Williams PageID.1799; ECF No. 129-7 claim form for a toy and a sauté pan from Walmart.com PageID.1839—40.
[13]     *E.g.*, ECF No. 129-2 PageID.1785; ECF No. 129-3 PageID.1796; ECF No. 129-7 PageID.1837.

Arizona's sales tax could not be levied on a retail trading business operating on the Navajo Reservation under a license issued by the Bureau of Indian Affairs. *Warren Trading*, 380 U.S. at 691-92. The Court reasoned that the federal legislation and regulations were comprehensive and that "no room remains for state laws imposing additional burdens upon traders." *Id.* at 690. Fifteen years later, in *Central Machinery*, the Supreme Court considered application of the same sales statute to a retailer without a license. Central Machinery sold 11 tractors to a farming business operated by the Gila River Indian Tribe. *Central Machinery*, 448 U.S. at 161. The farms were located exclusively on Indian land, the transaction was solicited on the reservation, the contract was formed on the reservation, and the payment for and delivery of the tractors occurred on the reservation. *Id.* And, the Bureau of Indian Affairs approved the transaction. *Id.* Unlike the retailer in *Warren Trading*, however, Central Machinery did not have a retail store on the reservation and was not licensed to engage in trade with the Tribe. *Id.* The Court found these two differences to be without distinction. *Id.* at 164-65. The Court again concluded that Arizona could not levy its sales tax on the transaction because the Indian Trader Statutes "preempts the field of transactions with Indians occurring on reservations." *Id.* at 165.

Fourteen years after *Central Machinery*, in *Milhelm Attea & Brothers*, the Supreme Court considered New York's scheme for taxing cigarette sales on Indian reservations. New York imposed a per pack tax on cigarettes, but tribal members who purchased cigarette packs on Indian reservations were exempt from the tax. *Milhelm Attea*, 512 U.S. at 64. To prevent non-Indians from avoiding the tax, New York imposed recordkeeping requirements and quantity restrictions on cigarette wholesalers for sales to tribes and tribal retailers. *Id.* The

wholesalers filed a facial challenge to the regulatory scheme. *Id.* at 69. The Court ultimately upheld the regulatory scheme.

The Court offered some clarification of the law concerning the sale of goods on Indian reservations. The Court clarified that, since *Warren Trading*, the Court's opinions have "undermined" the proposition that "no state regulation of Indian traders can be valid." *Milhelm Attea*, 512 U.S. at 71 (citing *Central Machinery*, 448 U.S. at 172). States can require tribal retailers to collect taxes on goods sold to non-Indians and to keep records of those sales. *Id.* at 71-72 (discussing *Moe v. Confederated Salish and Kootenai Tribes of the Flathead Reservation*, 425 U.S. 463 (1976) and *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134 (1980)).

KBIC is not entitled to summary judgment on Count 1. Because this dispute does not rest on any factual dispute, the Court concludes Defendants are entitled to summary judgment and dismissal of Count 1. Under Michigan law, the burden of the sales tax falls on the retailer. In this lawsuit, the retailers are non-Indian entities. The Supreme Court has expressly rejected any categorical bar or *per se* rule which would prevent the collection of sales tax in these circumstances. *See Chickashaw Nation*, 515 U.S. at 459 ("But if the legal incidence of the tax rests on non-Indians, no categorical bar prevents enforcement of the tax; . . . .").

KBIC's authority does not support the conclusion that a *per se* rule prohibits the application of state sales taxes to retailers simply because the sale, lease or rental of tangible personal property is made to a member of an Indian tribe or the Tribe itself and because the transaction occurred within KBIC's Indian country. While *Warren Trading* and *Central*

*Machinery* might suggest such a categorical rule, the Supreme Court disavowed any such interpretation in *Milhelm Attea*.  Furthermore, the statements in *Milhelm Attea* on which KBIC relies are, at best, dicta.  The issue in *Milhelm Attea* was the sale of cigarettes to non-Indians.  Any comments by the Court about sales to Indians were not essential to the holding.

Similarly, KBIC's authority does not support the conclusion that a *per se* rule prohibits state sales taxes on all retailers for transactions with a member of an Indian tribe or the Tribe itself where the object of the transaction will be used in their Indian country.  The holding in *Bracker*, which the Court quoted earlier, undermines completely KBIC's argument.  The Court explained that courts must perform "particularized inquiry." *Bracker*, 448 U.S. at 145.  Notably, *Central Machinery* and *Bracker* were companion cases issued on the same day.

## B.  Count 2 - Sales Tax - *Bracker* Balancing Test[14]

In Count 2, KBIC asserts that federal and tribal interests outweigh Michigan's interests relevant to the assessment of Michigan's sales tax on non-Indian retail sellers for goods sold to KBIC and its members and used by KBIC and its members in KBIC's Indian country.  Both parties have requested summary judgment on Count 2.  KBIC argues that the federal government and tribal governments share an interest in tribal economic development and in tribal self-government.  KBIC attempts to identify how the federal government has

---

[14]    Plaintiff's second motion for partial summary judgment.  (ECF No. 364 Pl. Br. at 23-38 PageID.5272-87.)  Defendants' motion for partial summary judgment.  (ECF No. 317 Def. Br. at 24-28 PageID.3569-3574.)

comprehensively regulated various of federal-tribal relations.  Finally, KBIC argues that Michigan cannot identify a sufficient interest to justify the sale taxes.

The parties do not dispute several important facts.  The undisputed facts relate to the "who" question.  First, the parties do not dispute that the retail sellers involved in the disputes relevant to this claim are not Indian retail sellers.  Second, the parties do not dispute that the purchase of the goods involved in these transactions was an Indian purchaser, either KBIC or a member of KBIC.

The Court concludes that the record contains no material dispute of facts that the exemplar transactions occurred in KBIC's Indian country.[15]  In addition to requesting information about the location of the transaction, the two forms used for refunds and exemptions also request information about the location of the filer's residence, where the item will be used, and the location of the seller.  The Court has reviewed each of the completed forms submitted for a refund by members of KBIC and attached to KBIC's first motion for partial summary judgment, exhibits 7 through 31.  On each form, the member checked the boxes indicating that the solicitation, payment and exchange of possession occurred on KBIC's reservation.  If the member signed a contract, that event also occurred on KBIC's reservation.  When Michigan addressed the question of location of the transaction in the letters responding to the submitted forms, Michigan avoided making any determination.  The letters contain the same generic statement.

---

[15]       The parties do dispute whether the Sales Tax Sourcing Rule, Michigan Compiled Laws § 205.69, applies to the determination of the location of these transactions.  Because the parties do not dispute that the exemplar transactions occurred in Indian Country, the Court does not need to decide if § 205.69 applies.

> In reviewing the information submitted regarding the above purchase, it appears that the transaction either took place within the Tribe's Indian Country, or it is unclear.  However, given that the balancing test favors the State in these instances, further analysis in this area is unnecessary.

(ECF No. 129-1 PageID.1170.)  In their response brief, Defendants argue that the location of the particular transactions are not in dispute because KBIC "does not identify a single claim in which Treasury failed to apply the *Bracker* test because it thought the sale occurred outside of Indian Country."  (ECF No. 365 PageID.5232.)

Application of the *Bracker* test requires the Court to determine whether federal legislation has pre-empted state taxation.  "Under the current doctrine, a State can impose a nondiscriminatory tax on private parties with whom the United States or an Indian tribe does business, even though the financial burden of the tax may fall on the United States or tribe." *Cotton Petroleum*, 490 U.S. at 175.  The particularized *Bracker* inquiry demands a "flexible pre-emption analysis sensitive to the particular facts and legislation involved." *Id.* at 176.  "It bears emphasis that although congressional silence no longer entails a broad-based immunity from taxation for private parties doing business with Indian tribes, federal pre-emption is not limited to cases in which Congress has expressly—as compared to impliedly—pre-empted the state activity." *Id.* at 176-77.

Courts consider the history of tribal sovereignty as backdrop to the *Bracker* balancing inquiry. *Cotton Petroleum*, 490 U.S. at 176.  The Supreme Court has observed, in its own opinions, a "trend . . . away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal pre-emption." *Rice v. Rehner*, 463 U.S. 713, 718 (1983) (quoting *McClanahan*, 411 U.S. at 172); *see Arizona Dept. of Revenue v. Blaze*

*Constr. Co., Inc.*, 526 U.S. 32, 36 n.2 (1999) ("Blaze also appears to argue that Arizona's tax infringes on the Tribe's right to make their own decisions and be governed by them and that this is sufficient, by itself, to preclude application of Arizona's tax.  Our decisions upholding state taxes in a variety of on-reservation settings squarely forecloses that argument.") (internal citation and citations omitted).  Thus, a court's determination of preemption should be "informed by historical notions of tribal sovereignty, rather than determined by them." *Id.* Courts should take into consideration "the tradition of Indian sovereignty as a 'backdrop against which the applicable treaties and federal statutes must be read' in our preemption analysis." *Rice*, 463 U.S. at 719 (quoting *McClanahan*, 411 U.S. at 172).

KBIC identifies four categories or circumstances where state sales taxes should be preempted: (1) the tax intrudes on federal government regulation intended to benefit a tribe; (2) the tax burdens reservation value in which a tribe has a significant interest; (3) the economic burden falls directly on a tribe; and (4) the tax is imposed without relation to a state service provided on the reservation to the taxpayer or to the activity burdened by the tax.  (ECF No. 364 at 26 PageID.5275.)  But, *Bracker* requires a particularized inquiry into the specific context.  Challenges to a state's tax based on the *Bracker* balancing test likely cannot be resolved based on broad categories as urged by KBIC.

KBIC also discusses four factors relevant to a *Bracker* analysis, which the Court analyzes below.

### 1.  Burden of the Sales Tax

First, KBIC argues that KBIC and its members bear the burden of the sales tax, which "should end" the inquiry.  (ECF No. 364 at 27 PageID.5276.)  The Michigan statute explicitly

places the legal incidence of the tax on the retail seller. *See* Mich. Comp. Laws § 205.52(1); *Andrie Inc.* 853 N.W.2d at 314. "[I]f the legal incidence of the tax rests on non-Indians, no categorial bar prevents enforcement of the tax; if the balance of federal, state, and tribal interests favors the State, and federal law is not to the contrary, the State may impose its tax." *Chickasaw Nation*, 515 U.S. at 459. KBIC cites *Ramah* and *Bracker*, which found that the economic burden fell on the tribe. The relevant sentences in *Ramah* and *Bracker* both end with footnotes that distinguish between the legal incidence of a tax and the economic burden of a tax. *Ramah*, 458 U.S. at 844 n.8; *Bracker*, 448 U.S. 151 n.15. In both footnotes, the Court explained that the economic burden of the tax, by itself, was not sufficient for preemption. Federal preemption occurs when the economic burden of the tax falls on a tribe *and* there exists "a comprehensive federal regulatory scheme, which . . . leaves no room for the additional burdens sought to be imposed by state law." *Bracker*, 448 U.S. at 151 n.15. That KBIC and its members bear the economic burden of the sales tax is a factor the Court considers, but it does not end the inquiry. The Court also notes that the goods that are transferred when the tax is levied derive no value whatsoever from any activity in KBIC's Indian Country. Michigan levies the tax on the initial sale from the non-Indian retail seller to KBIC or its members.

### 2. Indian Sovereignty Interests

As the second consideration, KBIC argues that the sales tax interferes with its sovereignty interests and its interest in self-governance. KBIC reasons that it operates more than twenty programs that provide government or government-type services to its members. KBIC funds those programs through its various enterprises, like the casinos and gaming

facilities.  The revenues from those enterprises are essential to KBIC's self-determination and economic development.  For this second argument, KBIC relies on the economic burden of the tax, which is passed along by the retail seller.  (ECF No. 364 at 29 PageID.5278 "There is no dispute that the Community and its members bear the economic burden of the Sales Tax in their purchases on the Reservation.").  KBIC reasons that when it pays the sales tax, the funds for its government programs and services are reduced.

KBIC has not established that tribal sovereignty provides a basis for preemption of Michigan's sales tax when applied to retail purchases on tribal lands by KBIC or its members from non-Indian retailers.  In *Rice*, the Court summarized how tribal sovereignty should be considered in a preemption analysis.

> When we determine that tradition has recognized a sovereign immunity in favor of the Indians in some respect, then we usually are reluctant to infer that Congress has authorized the assertion of state authority in that respect except where Congress has expressly provided that State laws shall apply. Repeal by implication of an established tradition of immunity or self-governance is disfavored.  If, however, we do not find such a tradition, or if we determine that the balance of state, federal, and tribal interests so requires, our pre-emption analysis may accord less weight to the backdrop of tribal sovereignty.

*Id.* at 719-20 (cleaned up; internal citations and citations omitted).  KBIC has not identified, or even attempted to identify, any history or tradition of tribal sovereignty that would function to preempt a generally applicable sales tax.  More specifically, the Supreme Court has rejected the argument that a state tax should be preempted on tribal sovereignty grounds because the tax generally burdens tribal revenues which consequently undermines a Tribe's ability to fund governmental programs.  *Colville*, 447 U.S. at 156-57; *see Wagnon*, 546 U.S. at 114 ("But the Nation cannot invalidate the Kansas tax by complaining about a decrease in

its revenues.") (citing *Colville*). In the challenge to imposition of the sales tax, tribal sovereignty remains a factor, but a factor that the Court affords little weight in this circumstance.

### 3. Federal Legislation

For its third consideration, KBIC argues that federal policy and federal statutes demonstrate comprehensive regulation such that the sales tax must be preempted. KBIC identified three such areas. KBIC contends (1) through the Indian Trader Statute, the federal government enacted comprehensive legislation regulating trade between Indian purchasers and non-Indian sellers on a reservation; (2) through the Indian Gaming Regulatory Act, (IGRA), the federal government established a comprehensive regulatory structure for Indian gaming, with the goal of promoting tribal self-sufficiency, tribal economic development, and tribal government; and (3) through the Indian Self-Determination and Education Assistance Act (ISDA), the federal government has established a framework for Indians to develop and to administer their own economies and programs with the goal of transitioning away from the federal government's trust responsibility.

KBIC has not established a basis for federal preemption under the Indian Trader Statutes. KBIC has not established that any of the exemplary transactions occurred with a federally licensed Indian trader or as part of a federally approved contract. *Warren Trading Post* and *Central Machinery* are the two Supreme Court opinions involving the Indian Trader Statutes. *Warren Trading Post* involved a federally licensed Indian trader located on a reservation and the Court precluded Arizona from taxing the proceeds of the Indian trader's transactions with the Navajo on the Navajo reservation. *Warren Trading Post*, 380

U.S. at 691-92 ("Insofar as they are applied to this federally licensed Indian trader with respect to the sales made to reservation Indians on the reservation, tese [sic] state laws imposing taxes cannot stand.")  In *Central Machinery*, the Court addressed the exact same state tax which Arizona attempted to levy on a transaction between the Gila River Indian Tribe and a company selling farming equipment.  The Court noted that "it should be recognized that the transaction at issue in this case was subject to comprehensive federal regulation.  Although appellant was not licensed to engage in trading with Indians, the Bureau of Indian Affairs had approved both the contract of sale for the tractors in question and the tribal budget, which allocated money for the purchase of this machinery."  *Central Mach.*, 448 U.S. at 165 n.4.

KBIC's interpretation of the Indian Trader Statutes presents a potential unintended consequence, one that would create huge economic problems for KBIC and its members. KBIC asks the Court to find that Congress intended to comprehensively regulate all trade between Indians and non-Indian retail sellers when the transaction occurs in Indian country. As noted in *Warren Trading Post*, federal regulations impose "penalties for acting as a trader without a license."  380 U.S. at 689.  Under the current regulations, non-Indians who introduce or trade goods on an Indian reservation without a license "shall forfeit all merchandise offered for sale to the Indians or found in his possession, and shall moreover be liable to a penalty of $1,368[.]"  25 C.F.R. § 140.3.  The retail sellers in *Warren Trading Post* and *Central Machinery* obtained federal approval of the disputed sales, which was why the state could not tax the transactions.  Adopting KBIC's interpretation of the Indian Trader Statute would require every single non-Indian retail seller who delivers goods to a reservation

to either obtain a license or seek federal approval or risk the penalty.  The unintended consequence of accepting KBIC's interpretation of the Indian Trader Statutes would be to shut off all trade between Indians and non-Indian retail sellers in KBIC's Indian country.

KBIC has not established a basis for federal preemption based on the IGRA.  The IGRA comprehensively regulates "class III gaming activity," which "means just what it sounds like—the stuff involved in playing class III games."  *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 792 (2014); *see Navajo Nation v. Dalley*, 896 F.3d 1196, 1207 (10th Cir. 2018) ("The Court's analysis in *Bay Mills* leads us to the clear conclusion that Class III gaming activity relates only to activities actually involved in the *playing* of the game, and not activities occurring in proximity to, but not inextricably intertwined with, the betting of chips, the folding of a hand, or suchlike.") (italics in original).  KBIC has not identified any of the exemplary transactions that involve the application of Michigan's sales tax to a gaming activity in KBIC's Indian country.

KBIC has not established a basis for federal preemption based on the ISDA.  The ISDA allows tribes to "enter into self-determination contracts with federal agencies to take control of a variety of federally funded programs."  *Menominee Indian Tribe of Wisconsin v. United States*, 577 U.S. 250, 252 (2016); *see Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 186 (2012) ("To that end, the Act directs the Secretary of the Interior, 'upon request of any Indian tribe . . . to enter into a self-determination contract . . . to plan, conduct, and administer' health, education, economic, and social programs that the Secretary otherwise would have administered.") (citing 25 U.S.C. § 450f(a)(1)).  KBIC reasons that if a state could not tax purchases made by a federal agency operating one of the programs, then a state

should not be able to tax a tribe that takes control of the federal program.  First, by crafting a test that balances competing interests, the Supreme Court implicitly rejected any suggestion that federally recognized tribes must be afforded the same immunity from state taxes that the federal government enjoys.  Second, KBIC has not demonstrated that any of the exemplary purchases were made by KBIC as part of the administration of an ISDA self-determination contract.  KBIC's authority on this argument, *United States v. California*, 507 U.S. 746, 753 (1993), does not support its argument.  That dispute arose from a contract between the federal government and Williams Brothers Engineering Company (WBEC), which included a reimbursement for costs.  California assessed sales and use taxes on WBEC.  Later, the federal government sued California to recover some of the costs charged by WBEC.  The Court began with the principle that a state cannot impose a tax on the federal government directly.  *Id.* ("Tax immunity is 'appropriate in only one circumstance: when the levy falls on the United States itself, or on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities.'") (citation omitted).  The next paragraph clarifies what was and what was not taxed.  "It is beyond peradventure that California did not tax—indeed, could not have taxed—the Federal Government in this case.  California taxed the WBEC.  And the Government's voluntary agreement to reimburse (or even fund in advance) WBEC for those taxes does not make the Government's payments direct disbursements of federal funds to the State."  *Id.*

### 4.  State Interests

KBIC argues that Michigan does not have a legitimate interest to support imposing its sales tax on the transactions.  KBIC objects to Defendants' use of the concept of "essential

government services" as a means of distinguishing between tax exempt purchases and purchases that are not exempt.  KBIC also argues that Michigan can only identify generalized state interests to support the sales tax and cannot establish any nexus between the activity taxed and the services provided by Michigan.

KBIC's objection to Michigan's use of the concept "essential government services" does not address Michigan's interest in levying its sales tax.  Michigan uses the concept to identify KBIC's sovereignty and self-governance interests.  Michigan does not use the concept to identify its own interests.  When Michigan concludes that KBIC's purchase supports an essential government service, it grants a sales tax refund.  Michigan does not use the concept to deny requests for tax exemption.  When Michigan concludes the purchase does not relate to essential government services, it applies the *Bracker* balancing test.  KBIC is not entitled to any relief on the basis of this particular objection.

The Court agrees with KBIC that Michigan's interest in imposing and collecting the sales tax supports only general projects and services.  The services provided by the revenue generated by the sales tax is not directly connected to the activity subject to the tax.  Michigan uses sales tax revenue to fund a variety of projects, including schools, roads, and local governments.  (*See* ECF No. 317-29 Darragh Rept. At 6 PageID.3701.)  KBIC and its members do receive a benefit from those services.  KBIC members can and do attend local schools.  KBIC members drive the local roads.  And, KBIC and its members are eligible to receive some of the services offered by local governments.  That KBIC also contributes to local schools and governments does not undermine Michigan's interest in those projects and services.

Nevertheless, KBIC has not demonstrated that Michigan's general interests are insufficiently related to the transactions such that the Court should preclude Michigan from collecting the tax.  In both *Bracker* and *Ramah*, the Supreme Court found that the state's general interest in raising revenue was insufficient to allow the state to levy the tax.  *Ramah*, 458 U.S. at 845; *Bracker*, 448 U.S. at 150.  But, weighing against that general interest in both *Bracker* and *Ramah* were comprehensive federal regulatory programs covering the very activity subject to the state's tax, something not present in this dispute.  *Ramah*, 458 U.S. at 839 ("Federal regulation of the construction and financing of Indian educational institutions is both comprehensive and pervasive."); *Bracker*, 448 U.S. at 149 ("The imposition of the taxes at issue would undermine that policy in a context in which the Federal Government has undertaken regulate the most minute details of timber production and expressed a firm desire that the Tribe should retain the benefits derived from the harvesting and sale of reservation timber.").

### 5.  Other Concerns

Weighing the interests of the federal government, KBIC, and Michigan, the Court concludes that the balance of interests does not result in federal preemption.  None of the federal statutes and regulations identified by KBIC so thoroughly permeate the federal relationship with KBIC that Michigan's sales tax would impermissibly interfere with the situation.  KBIC has not identified any historical tradition of sovereignty concerning the purchase of ordinary goods used in daily life and in commercial enterprises.  And, while Michigan has only a general interest in raising revenue, the counterbalancing interests are insufficient for this Court to conclude that the sales tax should be preempted.  Accordingly,

Defendants are entitled to summary judgment on Count 2 and **KBIC** is not entitled to summary judgment on Count 2.

In addition to the interests discussed above, which were advanced by **KBIC**, the Court identifies two other concerns that support the Court's conclusion.  First, the earliest federal regulation of Indian traders dates to 1790.  *Warren Trading Post*, 380 U.S. 685.  The Indian Trader Statutes were first enacted in 1882.  The modern retail sales tax in the United States began sometime in the late 1920s or early 1930s.  By 1970, most states had adopted some sort of retail sales tax.[16]  While this scenario—non-Indian retail sellers conducting transactions in Indian Country—may have been less common in the past, with the explosion of on-line shopping and delivery services, the situation would appear relatively ubiquitous except for the most isolated Indian reservations.   Nevertheless, **KBIC** has not identified a single instance in which state's general, non-discriminatory retail sales tax, collected from a non-Indian retail seller, has been successfully challenged by an Indian purchaser when the transaction occurred in Indian Country.

Second, **KBIC** does not distinguish between purchases made by the Tribe and purchases made by its members.  Indeed, **KBIC** argues that its "interests apply with equal force to refund and exemption claims submitted by Community members."  (ECF No. 364 at 30 PageID.5279.)   The authority cited by **KBIC** on this point does not support the conclusion it asserts.  And, none of **KBIC**'s authority involves a *Bracker* balancing analysis, which requires a particularized inquiry.  While Michigan's interests might not change, the

---

[16]      Kirk J. Stark, *The Uneasy Case for Extending the Sales Tax to Services*, 30 Fl. St. U. L. R. 435, 440 (2003)

federal and tribal interests may be affected by the purchaser and the goods purchased.  For example, KBIC's purchase of natural gas to heat a bingo hall (ECF No. 155-2 PageID.2442) may implicate certain federal and tribal interests that would not be affected by a community member's purchase of natural gas to heat a home (ECF No. 155-3 PageID.2452).  KBIC's purchases of accessories for law enforcement vehicles (ECF No. 155-1 PageID.2440) may implicate certain federal and tribal interests that would not be affected by a community member's purchase of auto parts for use in a personal vehicle (ECF No. 129-1 PageID.1773).  And, clothing and uniform purchases by one of the tribal enterprises that is part of a casino may implicate federal and tribal interests (ECF No. 129-20 PageID.1974) that would not be affected by clothing purchases made by a member of KBIC (ECF No. 129-12 PageID.1895).  By treating all purchases equally, KBIC has not engaged in the sort of specific inquiry required by the *Bracker* test.

Finally, the Court concludes that Defendants' process for determining whether refunds of the sales tax are appropriate does not violate *Bracker* balancing.  *Bracker* requires a particularized and specific inquiry.  The exemplary requests illustrate the difficulty in reaching broad categorical conclusions about when the sales tax should apply to a particular transaction.  The forms created by Defendants seek information about the specific purchase, information that is relevant under the *Bracker* test.  To the extent KBIC advances a *Bracker* challenge to the process for obtaining a refund, KBIC is not entitled to any relief.

### C.  Count 3 - Sales Tax - Tribal Self Government[17]

In Count 3, KBIC asserts that Michigan's sales tax, when applied to purchases and leases made by KBIC and its members within KBIC's Indian country, infringes KBIC's rights of self-government and inherent sovereignty.  Both parties request summary judgment on Count 3.  In its motion, KBIC argues that tribal sovereignty functions as an independent barrier to Michigan's ability to levy its sales tax on transaction that occur in KBIC's Indian country.  "The power to tax transactions occurring on trust land and significantly involving a tribe or its members is a fundamental attribute of sovereignty which tribes retain unless divested of it by federal law or necessary implication of their dependent status."  *Colville*, 447 U.S. at 152.

As presented to the Court, this claim can be resolved as a question of law.  The parties have not identified any disputes of material fact relevant to this claim.

The Court concludes that tribal sovereignty and the right to self-government do not preclude Michigan from levying its sales tax on transactions involving Indian purchasers and non-Indian retail sellers that occur in Indian Country.  The principles of Indian sovereignty and tribal self-government do not prohibit or preclude the state in which the reservation lies from exercising any regulatory authority on tribal lands.  *See Nevada v. Hicks*, 533 U.S. 353, 361-62 (2001) ("Our cases make clear than the Indians' right to make their own laws and be governed by them does not exclude all state regulatory authority on the reservation.  State

---

[17]     Plaintiff's second motion for partial summary judgment.  (ECF No. 364 Pl. Br. at 41-44 PageID.5290-5293.)  Defendants' motion for partial summary judgment.  (ECF No. 317 Def. Br. at 29 PageID.3574.)

sovereignty does not end at the reservation's border.  Though tribes are often referred to as 'sovereign' entities, it was 'long ago' that 'the Court departed from Chief Justice Marshall's view that 'the laws of a State can have no force within reservation boundaries.'') (cleaned up).

As explained above, the Supreme Court in recent years considers tribal sovereignty only as a backdrop to the question of federal preemption.  Notably, KBIC has not cited any court opinion that supports its claim that the right to self-government provides a basis for a court to preclude a state from taxing transactions in Indian Country.  In *Colville*, the Supreme Court considered and rejected a similar self-government challenge to a state's tax. Washington State levied a cigarette excise tax on the sale and use of cigarettes throughout the State.  The Colville Tribe, located in Washington State, levied its own tax on the sale of personal property, including cigarettes.  The Colville Tribe objected to Washinton's tax arguing, among other things, tribal sovereignty.  The Court rejected the Tribe's argument, holding that the imposition of the tax on the sale of cigarettes on the Tribe's reservation would not "contravene the principle of tribal self-government."  *Colville*, 447 U.S. at 161.

Nine years later, in *Cotton Petroleum*, the Court considered a challenged to New Mexico's severance tax on the oil and gas production.  Cotton Petroleum, a non-Indian company with rights to extract oil and gas from leases on the Jacarilla Apache Reservation, filed the lawsuit.  The Court explained that the leases were subject to the taxing jurisdiction of three different entities: the federal government, New Mexico, and the Tribe.  *Cotton Petroleum*, 490 U.S. at 188-89.  The Court found that the federal government had not prohibited taxation by either the Tribe or New Mexico.  *Id.* at 189.  The Court held that "[u]nless and until Congress provides otherwise, each of the other two sovereigns has taxing

jurisdiction over all of Cotton's leases." *Id.* This holding at least implicitly rejects the conclusion that a tribe's taxing authority as part of its sovereign powers ousts a state's taxing authority over the same land.

### D.  Count 4 - Sales Tax - Indian Commerce Clause[18]

In Count 4, KBIC alleges that Michigan's sales tax, when imposed on transactions between non-Indian retail sellers and KBIC and its members in KBIC's Indian country, violates the Indian Commerce Clause.  Defendants request summary judgment on Count 4. In its response, KBIC abandons Count 4, and rests its challenges to Michigan's sales tax on the other claims.  (ECF No. 370 Def. Resp. at 22 n.14 PageID.5596.)

Defendants are entitled to summary judgment on Count 4 as KBIC has waived any opposition to the dismissal of its Indian Commerce Clause claim.

### E.  Count 5 - Use Tax - *Per Se* Rule

#### 1.  Use Taxes Generally[19]

In Count 5, KBIC alleges that when the legal incidence of a state's use tax falls on a tribe or its members for activities occurring within their Indian country, the tax violates the Supremacy Clause.  And, when the tribe and its members use the property both on and off their Indian country, the State must have some mechanism for apportioning the use tax. KBIC argues "Defendants are absolutely precluded from imposing the Michigan use tax upon the Community or its members with respect to their use, storage, or consumption of

---

[18]    Defendants' motion for partial summary judgment.   (ECF No. 317 Def. Br. at 29-30 PageID.3574-75.)
[19]    Plaintiff's first motion for partial summary judgment.   (ECF No. 126 Pl. Br. at 30-32 PageID.1629-31.)

tangible personal property or services within the Reservation—regardless of whether it is also used outside the Reservation." (ECF No. 126 at 32 PageID.1631.) KBIC relies on *Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation*, 425 U.S. 463 (1976), *Washington v. Confederated Tribes of Colville Indian Reservation*, 477 U.S. 134 (1980), *Oklahoma Tax Commission v. Sac & Fox Nation*, 508 U.S. 114 (1980), and *Oklahoma Tax Commission v. Chickasaw Nation*, 515 U.S. 450 (1995).[20] All four cases involved, in relevant part, state taxes on motor vehicles or motor fuels. And, in all four cases, the Court found problems with the manner in which the state taxes were enforced.

The parties approach this claim as a question of law. They generally agree that there are no material facts in dispute. KBIC acknowledges that Defendants grant their refund requests when the goods are stored, used, or consumed entirely within KBIC's Indian country. (ECF No. 128-6 Ans. To Interrogatory #3 PageID.1702.)

*Moe v. Confederated Salish and Kootenai Tribes of the Flathead Reservation* involved a challenge to Montana's personal property tax on motor vehicles owned by tribal members, among other things. *Moe*, 425 U.S. at 468. Montana and local governments built and maintained the state highways, county roads, and streets on the reservation. *Id.* at 467. The Court rejected that fact as a basis for distinguishing the holding in *McClanahan*. *Id.* at 476. And, the Court found that there was no basis for distinguishing the treaties and federal

---

[20] Plaintiffs also discuss *Chosa v. Michigan Department of Treasury,* Mich. Tax Tribunal Dkt. No. 283437 (Apr. 20, 2005.) The Michigan Tax Tribunal Website does not make the opinion available; it has been archived. Plaintiffs filed a copy of the opinion. (ECF No. 128-9 PageID.1730-34.) The dispute was resolved in the Small Claims Division of the Michigan Tax Tribunal. By statute, unless otherwise designated, decisions issued by the Small Claims Division are without precedent. *See* Mich. Comp. Laws § 205.765.

statutes that governed the outcome in *McClanahan*. *Id.* at 477. Thus, following *McClanahan*, the personal property tax imposed on personal property (motor vehicles) located within the reservation could not be applied.[21] *Id.* at 480-81.

Washington v. Confederated Tribes of the Colville Indian Reservation involved Washington's vehicle excise tax imposed on Indian-owned vehicles.[22] *Colville*, 447 U.S. at 139. The excise taxes were imposed for the "privilege of using the covered vehicles in the State," and the tax was assessed annually at a percentage of the fair value of the vehicle. *Id.* at 162. The Court noted that the "only difference between the taxes" in *Moe* and here was the name: an excise tax and a personal property tax. *Id.* at 163. While the Court invalidated the tax as applied to Indians, it noted that Washington could have "tailored its tax to the amount of actual off-reservation use, or otherwise varied something more than nomenclature[.]" *Id.* at 163-64.

In *Oklahoma Tax Commission v. Sac and Fox Nation*, the Indian tribe challenged Oklahoma's vehicle excise tax and the vehicle registration fee. *Sac and Fox Nation*, 508 U.S. at 119. The excise tax was imposed upon the transfer of a vehicle registered in the state and the registration fee was imposed annually with a flat rate plus a percentage of the value of the vehicle. *Id.* The tax and the fee were imposed to "provide funds for 'general governmental functions.'" *Id.* Sac and Fox Nation required its members to register vehicles with the Tribe and issued tribal license plates. *Id.* at 119-20. Oklahoma did not attempt to collect taxes on

---

[21]     In *McClanahan*, the Court held that the state income tax levied on Indians whose entire income was derived from reservation sources "interfered with matters which the relevant treaty and statutes leave to the exclusive province of the Federal Government and the Indians themselves. The tax is therefore unlawful as applied . . . ." *McClanahan*, 411 U.S. at 165.

[22]     Also at issue and addressed by the Court was Washington's cigarette tax.

tribal-registered vehicles.  *Id.* at 120.  But, when a tribal-registered vehicle was sold to a non-Indian, the new owner had to pay the current and delinquent excise taxes, the registration fee for the year, and a penalty registration year for one previous year.  *Id.*  The Court held that Oklahoma could not apply the vehicle excise tax and the registration fee, finding no meaningful way to distinguish *Moe* and *Colville*.  *Id.* at 127.  "Like the taxes in both those cases, the excise tax and the registration fee are imposed in addition to a sales tax; the two taxes are imposed for use both on and off Indian country; and the registration fees are assessed annually based on a percentage of the value of the vehicle."  *Id.*

*Oklahoma Tax Commission v. Chickashaw Nation* is the most recent of the four cases.  Oklahoma imposed a motor fuel excise tax on fuel sold by Chickashaw Nation retail stores on tribal trust land.  After examining the state statute, the Count concluded that the legal incidence of the tax fell on the retailer, not the distributor or the consumer.  *Chickashaw Nation*, 515 U.S. at 462.   The Court concluded, as the statue was written, it could not be enforced because the legal incidence of the tax fell on a tribe or tribal members for sales made inside Indian country and there was no clear congressional authorization allowing the tax.  *See id.* at 458-60.

Defendants attempt to distinguish Michigan's use tax from the taxes involved KBIC's authority.  First, Michigan's use tax is an excise tax levied on the exercise of a privilege, such as the buying or selling the property, and is not a tax on the property itself.  *See Sullivan v. United States*, 395 U.S. 169, 175 (1969); *Market Place v. City of Ann Arbor*, 351 N.W.2d 607, 611-12 (Mich. Ct. App. 1984) (citations omitted).  UTA provides that the tax is "for the privilege of using, storing, or consuming tangible personal property in this state . . . ."  Mich.

Comp. Laws § 205.93(1).  Second, the use tax does not resemble a property tax because it is calculated on the sale price not the value of the vehicle and it is assessed once, not annually. Finally, Michigan does not assume the vehicle will be used on state roads.  The exemption form asks the where the item will be used (tribe's reservation, tribe's trust land, other Michigan location, or out of state).  (Form PageID.1684.)  Defendants assert the request for an exemption is denied if the "other Michigan location" box is checked.

KBIC is entitled to summary judgment on Count 5 of their complaint.  As written, the Court cannot meaningfully distinguish Michigan's UTA from the state tax in *Sac and Fox Nation*.  Both taxes were excise taxes imposed upon the privilege of using the vehicle in the state.  The Oklahoma tax was levied once.  The Oklahoma excise tax was calculated on vehicle's value while Michigan's excise tax is calculated on the sale price.  This is a difference without a meaningful distinction.  Presumably, the sale price has a connection to the value of the vehicle.  Finally, Michigan's UTA does not apportion the tax based on any off-reservation use, a feature the Supreme Court has consistently considered when Tribes have successfully challenged state taxes on vehicles.  The statute precludes apportionment.  When tangible property is acquired for tax exempt uses and the property is subsequently put to a taxable use, the tax is levied.  Mich. Comp. Laws § 205.93(1).  And, when tangible personal property is converted to a taxable use the tax is levied without regard to any subsequent tax-exempt use.  *Id.*

### 2.  Use Taxes on Leases[23]

---

[23]      Plaintiff's first motion for partial summary judgment.   (ECF No. 126 Pl. Br. at 27-29 PageID.1626-28.)

In its complaint, KBIC alleges that Michigan denies the claims for use taxes on items leased from out-of-state lessors.  (Compl. ¶ 54 PageID.807.)   KBIC contends the lessor is not using the items and the lessor is not located in Michigan.  (*Id.*)  KBIC also contends the denial of these claims violates the *per se* rule that a state cannot tax Indian traders in Indian country.  For example, KBIC paid a use tax on the rental of a dish washing machine for use on its reservation, submitted a claim for a refund, which was denied.  (ECF No. 129-9 PageID.1864-71.)

Under Michigan law, a business that acquires tangible personal property for the purpose of leasing the property may elect to pay use tax on the rental receipts rather than the sales tax on the initial purchase.  *See* Mich. Comp. Laws § 205.95(4); Mich. Dep't of Treasury, Revenue Admin. Bulletin No. 2015-25.[21]  "If the lessee of the property is an entity that is exempt from tax under the Use Tax Act . . . then the lessor is not liable for use tax on the rental receipts."  (RAB 2015-25 PageID.1740.)   Section 205.104b outlines the responsibilities of the seller (lessor) and the purchaser (lessee) for claiming exemptions and refunds for use taxes.

Although it is not clear that KBIC has a pled a distinct claim relating to use taxes for leases, KBIC would be entitled to summary judgment on the claim.[25]  Defendants concede that KBIC is exempt from use taxes on leases and rentals when the items are used exclusively

---

[21]     The Michigan Department of Treasury's website includes links to each of its Revenue Administrative Bulletins.  KBIC submitted a copy of the document.  (ECF No. 128-10 RAB 2015-25 PageID.1736-40.)

[25]     Defendants assert that KBIC does not have any specific prayer for relief concerning use taxes on leases.  (Def. Resp. at 19-20 PageID.2115-16.)

in Indian country.  (ECF No. 152 Def. Resp. at 18-19 PageID.2114-15.)  The legal incidence of the State's use tax falls on the consumer (the lessee), although the tax is remitted to Michigan by the lessor. Michigan's own guidelines, RAB 2015-25, indicates that use taxes need not be paid by a lessor when leasing property to a tax-exempt entity.  In its denial letters, Michigan incorrectly asserted that the use tax was still owed by the lessor, and that the lessor could choose to pass the tax along to the Tribe.  (*See, e.g.,* PageID.1864.)  Defendants insist that this issue is already being addressed.  (Def. Resp. at 19 PageID.2115.)

### F.  Count 6 - Sales and Use Taxes - 1842 Treaty[26]

In Count 6, KBIC asserts that Michigan's sales and use taxes, when levied on transactions in certain geographic area (the Ceded Area), violate Article II of the 1842 Treaty. In its motion, KBIC explains that, under the terms of the 1842 Treaty, federal law governs in the Ceded Area and preempts state law.  KBIC reasons that the treaty remains in force and necessarily preempts Michigan law.

KBIC raised the same argument against the TPTA in its earlier lawsuits.  And, Defendants made many of the same responses.  In the 2003 case, Judge Bell found that he did not need to resolve much of the parties' disputes concerning the interpretation and enforceability of the treaty to resolve the claim presented by KBIC about enforcement of the TPTA.

> For purposes of these cross-motions for summary judgment the Court need not concern itself with disputed issues regarding whether the trade an intercourse provisions of Article II of the 1842 Treaty were superseded or

---

[26]     Plaintiff's second motion for partial summary judgment.  (ECF No. 364 Pl. Br. at 44-50 PageID.5293-99).  Defendants' motion for partial summary judgment.  (ECF No. 317 Def. Br. at 30-43 PageID.3575-88.)

> abrogated following the 1954 Treaty, or whether Article II was understood by
> the signatories to be a liquor clause that was abrogated by Article 7 of the 1854
> Treaty, or whether the Community has unclean hands with respect to its 1842
> Treaty argument because it routinely ignores trade and intercourse provisions
> in its sales of alcohol, tobacco and gambling services.  Even if this Court were
> to assume that the 1842 Treaty is still binding and that it incorporates the
> Indian trade and intercourse laws, the Court is satisfied that the plain meaning
> of Article II does not prohibit the State from collecting its excise tax on
> cigarettes sold by the Community to non-Indians.

*KBIC v. Rising*, 2005 WL 2207224, at *11.  Judge Bell concluded that federal law permits

Michigan to levy its tobacco tax on the sale of cigarettes to non-Indians, even in the Ceded

Area.

> The 1842 Treaty plainly makes federal law applicable to the Ceded Area, and
> federal law permits the states to impose their tobacco taxes on cigarette sales
> to nonmembers of the Tribe.  The 1842 Treaty does not limit the State's ability
> to impose minimal burdens on the Community to assist in the collection of
> the State's cigarette taxes.

*Id.*  The Sixth Circuit affirmed Judge Bell's reasoning and conclusion.  *Rising I*, 477 F.3d at

853.

In the 2005 lawsuit, Judge Quist reached the same conclusion for KBIC's challenge

to Michigan's sales and use taxes.  Like Judge Bell, Judge Gordon Quist reasoned that the

1842 Treaty made federal law applicable to the Ceded Area, and that federal law permits

state taxation.  *See KBIC v. Kleine*, No. 2:05-cv-224 (W.D. Mich. Mar. 27, 2008) (opinion).[27]

On appeal, the Sixth Circuit found that KBIC's challenges to the use and sales taxes were

not ripe.  Regarding the 1842 Treaty, however, the circuit court held that the treaty did not

---

[27]     Judge Quist issued an opinion granting Defendants' motion for summary judgment.  In
footnote 4 on page 18 of that opinion (ECF No. 144 PageID.2409), Judge Quist wrote "[t]hus, if
taxation is permissible under federal law, it is likewise permissible under the terms of the 1842 treaty.
Therefore, there is no need for the Court to engage in a separate analysis of the 1842 treaty."

create an "independent barrier" to Michigan's taxes on the ceded area. *Rising II*, 569 F.3d at 594 ("To the extent that the Community contends that the treaty creates an independent barrier to state taxation of transactions with Indians in the ceded area, that argument was rejected by this Court in *Keweenaw Bay Indian Community v. Rising (Rising I)*, 477 F.3d 881, 893 (6th Cir. 2007)). The court left open the question of whether the Ceded Area constitutes Indian Country, as that phrase is defined in 18 U.S.C. § 1151. *Id.* at 594.

This Court must follow the prior opinions issued by the Sixth Circuit. The 1842 Treaty does not create an independent barrier to Michigan's sales and use taxes in the Ceded Area. Judge Bell's reasoning in the 2003 lawsuit over tobacco taxes is persuasive authority and applies equally to KBIC's challenge in this lawsuit to sales and use taxes in the ceded area. The Sixth Circuit affirmed Judge Bell's decision concerning the enforcement of state tobacco taxes in the ceded area. Judge Quist reached a similar conclusion about sales and use taxes in the 2005 case, a conclusion also affirmed by the Sixth Circuit. The 1842 Treaty does not function as a separate, distinct, and independent barrier to state taxation.

G.  Count 7 - Process for Exemptions and Refunds - Equal Protection and Due Process[28]

In Count 7, KBIC argues the system for exemptions and refunds violates both Equal Protection and Due Process.

### 1.  Due Process

KBIC complains that the process for requesting a tax refund imposes a burden that no other group must bear. KBIC pleads that Defendants do not act on all of the claim forms,

---

[28]     Plaintiff's first motion for partial summary judgment.   (ECF No. 126 Pl. Br. at 32-37 PageID.1631-36.)

do not explain the basis for denying applications, and deny applications arbitrarily. (Compl. ¶ 140 PageID.834.) In its brief, KBIC succinctly summarizes its Due Process claim, but does not cite any authority for it. (ECF No. 126 at 32-33 PageID.1631-32.) KBIC argues that Defendants take weeks or months to respond to their claims; Defendants use irrelevant or inapplicable criteria for resolving the claims; Defendants deny about 90% of the claims; and the manner in which the claims are approved make it difficult for Plaintiffs to determine whether all of the claim was approved and paid. (*Id.*)

Defendants address the due process claim in some detail. Defendants explain that the Supreme Court permits states to enlist tribes, tribal members and non-Indians to collect lawful taxes so long at the burden does not interfere with tribal sovereignty or self-governance. Defendants summarize how the process for exemptions and refunds is fair.

The Court interprets KBIC's claim as one for violation of procedural due process, not substantive due process. *See Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1988) (distinguishing between procedural and substantive due process); *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012) (same). Neither party suggests or argues that a genuine issue of material fact relevant to this claim exists. Both parties address this claim as a question of law.

KBIC is not entitled to summary judgment for its due process claim. KBIC failed to support this portion of its motion with any authority that would establish a procedural due process violation based upon the facts upon which the parties do not dispute. Here, the taxes were levied on the non-Indian retailer, so KBIC and its members have not been burdened with the collection of the tax. For taxation claims, a state satisfies due process

concerns by providing either a pre-deprivation or a post-deprivation process that includes a "fair opportunity to challenge the accuracy and legal validity of their tax obligation, [and] also a 'clear and certain remedy,' for any erroneous or unlawful tax collection to ensure that the opportunity to contest the tax is a meaningful one." *McKesson Corp. v. Div. of Alcoholic Beverages and Tobacco, Dept. of Bus. Regulation of Florida*, 496 U.S. 18, 38 (1990) (internal citation omitted). As part of their response, Defendants assert that Michigan "provides a pre-tax exemption process, a post-tax refund process, and methods to challenge both decisions." (ECF No. 152 Def. Resp. at 35 PageID.2131.) KBIC has not addressed this argument. The Court observes that, in its reply, KBIC neglected to address any of Defendants' arguments or authority on the due process claim.

On this record, Defendants are entitled to summary judgment on KBIC's due process claim. KBIC does not deny that Michigan provides a mechanism for obtaining refunds and a mechanism for challenging the denial of refunds. At best, KBIC demonstrates that the refund process is slow, cumbersome, and produces adverse results. Such evidence does not establish a constitutionally deficient process. "The Due Process Clause simply does not mandate that all governmental decision making comply with standards that assure perfect, error-free determinations." *Mackey v. Montrym*, 443 U.S. 1, 13 (1979); *see Chernin v. Welchans*, 844 F.2d 322, 329 (6th Cir. 1988) ("The due process clause has never been construed to require that all government acts assure perfect, errorless determinations."). Nor does the Due Process Clause require a government to adopt a more favorable procedure simply because a claimant does not like the one provided. *See Heller v. Doe*, 509 U.S. 312, 332 (1993) ("'The Due Process Claus does not . . . require a State to adopt one procedure

over another on the basis that it may produce results more favorable to' the party challenging the existing procedures.") (quoting *Medina v. California*, 505 U.S. 437, 451 (1992)).

## 2.   Equal Protection

KBIC pleads that Michigan's process for seeking exemptions and refunds treats KBIC and its members "far differently than such other tax-exempt purchasers, lessees, renters, and users and to the detriment of the Community and its members, with respect to the exercise of their tax immunities."  (Compl. ¶ 139 PageID.834.)  In its brief, KBIC contends its member are treated differently based on race.  (ECF No. 126 at 33-34 PageID.1632-33.)  Essentially, KBIC and its members must use one form for seeking tax refunds while all other individuals and entities who might claim some sort of tax relief can use a different, less burdensome, form.

Like the Due Process challenge, the parties generally agree on the facts underlying this claim.  Neither party argues that a material dispute of fact exists relevant to KBIC's Equal Protection claim.  Both parties address the claim as a question of law.

The Equal Protection Clause provides that no State may "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend XIV, § 1, cl. 4. Generally, the clause stands for the principle that similarly situated persons should be treated alike.  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  "'The Equal Protection Clause prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference.'"  *Loesel v. City of Frankenmuth*, 692 F.3d 452, 461 (6th Cir. 2012) (quoting *Rondigo, LLC v. Twp. of*

*Richmond*, 641 F.3d 673, 681-82 (6th Cir. 2011)).  Unless the state infringes the exercise of a fundamental right, or the state categorizes on the basis of a suspect characteristic, a court applies rational basis review to an Equal Protection claim.  *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

The Court first considers whether KBIC's claim must be analyzed under strict scrutiny or under rational basis review.  KBIC does not allege that Michigan's tax laws burden any fundamental right.  KBIC alleges that Defendants have, without statutory authority, developed a "system" that requires KBIC and its members to submit a unique document for tax exemptions or refunds.  (Compl. ¶ 139-142 PageID.834-35.)  In its brief, KBIC challenges the "burdensome Refund and Exemption Process."  (PageID.1631-37.)  The parties agree that, following *Rising II*, Michigan developed a formal process for those tribes without a tax agreement, and their members, to file claims for exempts and refunds.  (Compl. ¶¶ 41 and 42 PageID.803-04; Pl. Br. at 9 PageID.1608; Def. Resp. Br. at 6-7 PageID.2102-03.)  All other tax-exempt individuals and entities use Form 3372.  (ECF No.  128-5 PageID.1692.)

KBIC has not established that any discrimination occurs because of race.  The process for seeking refunds and exemption is not required for all Indians or even all Indian tribes.  The process and unique form must be used only by a federally recognized Indian tribe that does not have a tax agreement with Michigan.  And, tribal membership, not race, determines whether the individual may use the process and the Form to seek a tax refund. *See Morton v. Mancari*, 417 U.S. 535, 553 n.24 (1974) (explaining that a hiring preference at the Bureau of Indian Affairs was not a racial preference because it "was not directed

towards a 'racial' group consisting of 'Indians'; instead it applies only to member of 'federally recognized' tribes.  This operates to exclude many individuals who are racially to be classified as 'Indians.'  In this sense, the preference is political rather than racial in nature."); *United States v. Eagleboy*, 200 F.3d 1137, 1138 (8th Cir. 1999) ("Consequently, persons of Indian descent who are not members of a recognized tribe are not covered by the policy even though the policy covers all persons who are in fact enrolled members of a recognized tribe.  To repeat, the criterion is tribal membership, not race.")

The fact that Michigan put the system in place as a means of obtaining exemptions and refunds from state taxes, rather than federal taxes, does not make a difference for KBIC's Equal Protection claim.  The Supreme Court has recognized that federal legislation concerning federally recognized tribes arises from the historic relationship between the federal government and the tribes' status as quasi-sovereign entities.  *Mancari,* 417 U.S. at 554.  At least one federal circuit court has questioned whether the holding in *Mancari* can be extended to all state statutes based on tribal status because states do not have the same historic relationship with Indian tribes.  *KG Urban Enters., LLC v. Patrick*, 693 F.3d 1, 19 (1st Cir. 2012).  *Patrick* recognized that some state legislation concerning Indian tribes would be valid extensions of *Mancari* "where the state acted pursuant to Congressional authorization."  *Id.* at 20 (discussing *Washington v. Confederated Bands and Tribes of the Yakima Indian Nation*, 439 U.S. 463 (1979)); *see also Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 733 (9th Cir. 2003) (summarizing the holding in *Yakima* as "when a state law applies in Indian Country as a result of the state's participation in a federal

scheme that 'readjusts' jurisdiction over Indians, that state law is reviewed as if it were federal law.").

In the Court's view, the tax exemption and refund system of which KBIC complains functions as an extension of the federal government's relationship with Indian tribes.  KBIC and its members can claim certain exemptions for state sales and use taxes because of their tax status as determined by the federal government.  That tax exempt status arises because the federal government has recognized KBIC's quasi sovereign status as a Tribe.  The Court concludes that Michigan's tax exemption and refund system merely uses the federal government's recognition of KBIC as an Indian tribe, a determination that carries with it some tax benefits.  And, the system also uses KBIC's determination of its membership, another determination that carries with it some tax benefits for individuals.  By basing the system of tax exemptions and refunds on KBIC's status as a federally recognized tribe, Michigan has not created a system based on race.  Nor is Michigan's use of KBIC's status as a federally recognized tribe a proxy for race.  *See Rice v. Cayetano*, 528 U.S. 495, 514-15 (2000) (finding that Hawaii's restriction on voting based on defined ancestry was a proxy for race).

Because the Court concludes that the tax system is not based on race, the Court applies rational basis scrutiny to KBIC's challenge to the system created by Michigan.  In the context of an equal protection challenge, courts must afford substantial deference to the choices of the legislature.  *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313-14 (1993).  The "legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Id.* at 315.  When applying rational

basis to an equal protection claim, the plaintiff must demonstrate that the legislative choice lacks a rational basis "either by negating every conceivable basis which might support the government action, or by demonstrating that the challenged government action was motivated by animus or ill-will." *Davis v. Prison Health Servs.*, 679 F.3d 433, 438 (citation omitted).  KBIC has not established that Michigan's tax exemption and refund system was motivated by impermissible animus or ill-will.[29]

KBIC has not put forth sufficient evidence to meet its burden to show that the challenged system of tax exemptions and refunds lacks a rational basis.  Among the justifications offer by Defendants for the difference in treatment between KBIC and other tax-exempt entities is the geographic criteria that KBIC must meet.  While other tax-exempt entities like Section 503(c) non-profit companies are exempt from sales taxes throughout Michigan, the exemption for KBIC and its members depend in part on where the sale occurs.  And, even if Defendants are ultimately wrong about whether the tax exemption depends on location, KBIC cannot succeed on its equal protection claim simply by proving that the justification was mistaken.  *See Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981).  Finally, the Court finds that KBIC has not demonstrated that it (and its members) are similarly situated to all other tax-exempt entities identified in the brief.  "In

---

[29]     KBIC (PageID.1635) points to a letter from Walter Fratzke (ECF No. 128-8 PageID.1728) stating that, for Indian tribes, Michigan is not "comfortable" using a system where the purchase presents a tax exemption certificate to the retailer.  Viewing this evidence in the light most favorable to KBIC does not create any disputed fact about Michigan's animus toward KBIC specifically or Indians generally.  Fratzke explains that ordinarily, if Michigan determines later that the transaction was taxable, Michigan pursues the purchaser.  But, Michigan cannot pursue Indian tribes in court because Indian tribes enjoy sovereign immunity.  The lack of comfort does not arise because Michigan has animus or ill-will toward KBIC or Indians, but because Michigan has no effective remedy.

the Equal Protection Clause context, very few taxpayers are regarded as similarly situated and thus entitled to equal treatment." *Alabama Dept. of Rev. v. CSX Transp., Inc.*, 575 U.S. 21, 28 (2015).

For these same reasons, Defendants are entitled to summary judgment on KBIC's Equal Protection claim.  The process for exemptions and refunds is not based on race.  The process for obtaining exemptions and refunds has a rational basis.

### H.  Count 8 - Exemption or Refund Process of Sales and Use Taxes - Other Violations of Federal Law[30]

In Count 8, KBIC alleges that the process for filing exemption claims and for refunds violates federal law.  In paragraph 144 of the complaint, KBIC enumerates those violations: (1) because sales and use taxes are preempted the process violates federal law; (2) the process is preempted under *Bracker* balancing; (3) the process violates the right of tribal sovereignty and self-government; (4) the process violates the Indian Commerce Clause; (5) the process violates the 1842 Treaty; and (6) the process violates sovereign immunity.

Defendants request summary judgment on Count 8.  Defendants argue that KBIC merely repeats the same legal theories underlying its challenges to the sales and use taxes. The only new legal theory rests on the notion of sovereign immunity.  Defendants reason that they have not sued KBIC for any sales or use taxes and they have not seized any of KBIC's property.  Defendants argue that KBIC cannot identify any theory of sovereign

---

[30]      Defendants' motion for partial summary judgment.   (ECF No. 317 Def. Br. at 43-44 PageID.3588-89.)

immunity that would support the relief it seeks.  Nor can KBIC find any legal support for its theory of sovereign immunity.

Defendants are entitled to summary judgment on Count 8.  Important here, the legal burden of the tax falls on the non-Indian retail seller, not on KBIC or the members of the tribe.  Generally, the same reasons KBIC's challenges to the taxes themselves fail also apply to this challenge to the process of obtaining a tax refund.  KBIC's sovereign immunity provides protection from lawsuits.  *See Rising I*, 477 F.3d at 395.  KBIC does not specifically address Defendants' argument that sovereign immunity does not provide a legal basis for a challenge to the exemption and refund process.  And, KBIC has not identified any legal authority that would support its claim.

## I.  Count 9 - Tobacco Tax - *Bracker* Balancing Test[31]

In Count 9, KBIC argues that federal and tribal interests outweigh Michigan's interests relevant to the assessment of Michigan's tobacco tax on the sale of tobacco products within KBIC's Indian country.  In its motion, KBIC contends that it creates value in its Indian country through the development of its tobacco retail business.  KBIC argues it has strong interests in self-determination, self-sufficiency, and economic development in the right to sell untaxed tobacco products.  KBIC asserts that Michigan cannot identity any legitimate interest supported by the tobacco tax levied on sales on the reservation by KBIC to non-Indians.

---

[31]    Plaintiff's second motion for partial summary judgment.  (ECF No. 364 Pl. Br. at 38-41 PageID.5287-90.  Defendants' motion for partial summary judgment.  (ECF No. 317 Def. Br. at 5-12 PageID.3550-57.)

Defendants argue that the Contraband Cigarette Trafficking Act (CCTA) makes the *Bracker* balancing test inapplicable.  Alternatively, Defendants argue that the balance of interests favor Michigan interests in enforcement of the tobacco tax within KBIC's Indian Country.

Both parties request summary judgment on this claim.  Neither party argues that a genuine issue of material fact exists relevant to Claim 9.  Both parties address the claim as a question of law.

Under the TPTA, Michigan imposes various taxes on tobacco products.  Mich. Comp. Laws § 205.427(1).  The TPTA also requires every person who transacts cigarettes, other than the retail consumer, to keep detailed records of each transaction.  *See id.* § 205.426.  Licensees remit the taxes to Michigan on a monthly basis for the tobacco products sold.  *Id.* § 205.427(3).  The Legislature has declared that "[i]t is the intent of this act to impose the tax levied under this act on the consumer of the tobacco products by requiring the consumer to pay the tax at the specified rate." *Id.* § 205.427a.  In 1999, Michigan notified all federally recognized Indian tribes that, going forward, cigarette taxes would be prepaid and that retailers within Indian lands would file for refunds for sales to the Tribe or its members.  *Rising I*, 477 F.3d at 884.  The Sixth Circuit upheld the scheme.  *Id.* at 892.

The Supreme Court has considered the regulatory burdens imposed on tribal entities by the tobacco tax laws enacted by multiple states.  "The Supreme Court permits states to impose a "minimal burden," on tribal retailers that are "reasonably tailored to the collection of valid taxes from non-Indians."' *Rising I*, 477 F.3d at 892 (quoting *Dep't of Taxation and Fin. Of New York v. Milhelm Attea & Bros., Inc.*, 512 U.S. 61, 73 (1994)); *see Milhelm*

*Attea*, 512 U.S. 73-75; *Colville*, 447 U.S. at 159-60 *Salish and Kootenai Tribes*, 425 U.S. at 482-83.

KBIC has not established that any federal statutes or policies provide a specific basis for federal preemption of Michigan's tobacco tax.  The Court infers that KBIC relies on the same areas of federal law discussed in KBIC's *Bracker* balancing claim against Michigan's sales and use taxes.  The Court's consideration of the Indian Trader Statutes, the IGRA, and the ISDA also applies here.  And, none of the three statutes specifically regulate tobacco sales.

KBIC has not established that tribal interests are a basis for federal preemption of Michigan's tobacco tax.  KBIC advances arguments similar to the arguments used to support its challenge to the sales and use taxes.  KBIC explains that all of the revenue generated from the sale of untaxed tobacco products goes to the General Welfare Support Program, which KBIC uses to assist members with certain expenses.  KBIC also argues that the untaxed tobacco products function as a complement to its gaming enterprises and are considered part of the gaming experience.  As explained in the denial of KBIC's challenge to the sales and use taxes, the Supreme Court has held that the loss of revenue that would be otherwise used to support tribal programs promoting self-governance and self-sustainability is not a sufficient reason for a court to find preemption.

KBIC has not established that on-reservation activities add any value to the tobacco products.  As the Court understands the situation, KBIC purchases from outside its reservation premade tobacco products and simply resells the products.  The value marketed to non-Indians is the avoidance of state taxes.  *See Colville*, 477 U.S. at 155 ("It is painfully

obvious that the value marketed by the smokeshops to persons coming from outside is not generated on the reservations by activities in which the Tribes have a significant interest.") The Supreme Court rejected the reasoning behind any interest a tribe might have in creating a tax-avoiding market on a reservation.

> What the smokeshops offer these customers, and what is not available elsewhere, is solely an exemption from state taxation. The Tribes asserts the power to create such exemptions by imposing their own taxes or otherwise earning revenue by participating in the reservation enterprises. If this assertion were accepted, the Tribes could impose a nominal tax and open chains of discount stores at reservation borders, selling goods of all descriptions at deep discounts and drawing custom from surrounding areas. We do not believe that principles of federal Indian law, whether stated in terms of pre-emption, tribal self-government, or otherwise, authorize Indian tribes thus to market an exemption from state taxation to persons who would normally do their business elsewhere.

*Id.*

Michigan has a strong and legitimate interest in the revenue raised by the tobacco tax because the value of the tobacco product was not created in KBIC's Indian Country. *See Colville*, 477 U.S. at 157 ("The State also has a legitimate governmental interest when the tax is directed at off-reservation value and when the taxpayer is the recipient of state services."). Michigan deposits most of the funds in the state school aid fund. *See* Mich. Comp. Laws §§ 205.432(2)(a), (3)(e), (4)(b), (5)(a), and (6)(a). Tribal members and non-members therefore both benefit from the tobacco tax. And, Michigan has more than simply a revenue raising interest in the tobacco tax. There exists a direct connection between the tax and efforts to reduce the use of tobacco. Portions of the tobacco tax specifically fund smoking prevention programs. *See* Mich. Comp. Laws §§ 205.432(2)(b), (3)(f), (4)(c), (5)(b), and (6)(b). By raising the price of the good, the tax itself discourages tobacco use.

Defendants have not demonstrated that the CCTA makes the *Bracker* balancing test inapplicable.  "The CCTA is a federal criminal statute that targets interstate cigarette trafficking."  *United States v. Khan*, 771 F.3d 367, 374 (7th Cir. 2014).  The CCTA prohibits any person from shipping, transporting, receiving, possessing, selling, distributing, or purchasing contraband cigarettes.  18 U.S.C. § 2342(a).  The statute primarily targets "contraband cigarettes," which it defines by referencing state tax law.  *See id.* § 2341(2) ("a quantity in excess of 10,000 cigarettes, which bear no burden of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found, if the State or local government requires a stamp . . . to evidence payment of cigarette taxes[.]"); *Grey Poplars Inc. v. One Million Three Hundred Seventy One Thousand One Hundred (1,371,100) Assorted Brands of Cigarettes*, 282 F.3d 1175, 1177 (9th Cir. 2002).  The CCTA explicitly allows a state to enforce its cigarette tax laws, including the seizure of contraband cigarettes.  18 U.S.C. § 2345(a).

Balancing the relevant federal, tribal, and state interest, the Court concludes that Michigan's tobacco taxes are not preempted by federal law.  With this conclusion, KBIC is not entitled to summary judgment on Count 9.  Defendants, however, are entitled to summary judgment on Count 9.  Defendants have demonstrated that the balance of interests weigh in favor of allowing Michigan to tax KBIC's sale of tobacco products to non-Indian consumers.

J.  Count 10 - Tobacco Tax - Tribal Self Government[32]

In Count 10, KBIC alleges that Michigan's enforcement of the TPTA violates KBIC's sovereign right to make its own laws.  KBIC also alleges that the seizure of its cigarettes, truck and trailer was violated its sovereignty and was unlawful because Michigan State Police officers conducted surveillance on KBIC's Indian country.  Defendants insist that TPTA does not violate tribal self-government.  Defendants also contend that tribal self-government and KBIC's rights as a sovereign do not prevent them from conducting investigations in KBIC's Indian country for crime that occurred outside of Indian country.  All parties approach this claim as a question of law.  No party has identified any dispute of fact.

First, KBIC has not established that the TPTA violates KBIC's rights as a sovereign. KBIC challenged the sales and use taxes on the same basis, which this Court resolved against KBIC.  The same reasoning applies this claim.  The holdings in *Colville* and *Cotton Petroleum* undermine KBIC's argument.  Unless prohibited by the federal government, which has not occurred here, Michigan has the authority to tax tobacco sales to non-Indians even when the sale occurs in Indian country.  *See Cotton Petroleum*, 490 U.S. at 189.  And, as the Supreme Court noted in *Hicks*, tribal sovereignty and self-government does not "exclude all state regulatory authority on the reservation."  533 U.S. at 361.

Second, KBIC has not established that the Michigan State Police violated KBIC's sovereignty by conducting an investigation in KBIC's Indian country.  KBIC's broad

---

[32]     Plaintiff's second motion for partial summary judgment.  (ECF No. 364 Pl. Br. at 41-44 PageID.5290-93.)  Defendants' motion for partial summary judgment.  (ECF No. 317 Def. Br. at 12-13 PageID.3557-58.)

assertion that a state cannot conduct any sort of law enforcement activities in Indian country does not accurately state the law.  In *Hicks*, the Supreme Court firmly rejected the principle advanced by KBIC here.  *Hicks*, 533 U.S. 353, 365-66 (2001) ("Nothing in the federal statutory scheme prescribes, or even remotely suggests, that state officers cannot enter a reservation including Indian-fee land to investigate or prosecute violations of state law occurring off the reservation.").  And, the Court held that "tribal authority to regulate state officers in executing process related to the violation, off reservation, of state laws is not essential to tribal self-government or internal relations—to 'the right to make laws and be ruled by them.'"  *Id.* at 364.  Three State Supreme Courts have followed *Hicks* as binding authority.  *See State v. Cummings*, 954 N.W.2d 371, 737-38 (S.D. 2021) (abrogating *State v. Cummings*, 679 N.W.2d 484 (S.D. 2004)); *State v. Clark*, 308 P.3d 590, 594-96 (Wash. 2013); *State v. Harrison*, 238 P.3d 869, 877-78 (N.M. 2010).

Defendants are entitled to summary judgment on Count 10.  Defendants have established that enforcement of the TPTA, including the investigation on the reservation and the prosecution of tribal members for off-reservation crimes, does not violate KBIC's sovereignty or right to self-government.

### K.  Count 11 - Tobacco Tax - Indian Commerce Clause[33]

In Count 11, KBIC alleges that the Indian Commerce Clause prevents the enforcement of the tobacco tax for sales in KBIC's Indian country, the seizure and forfeiture of its property, and the criminal prosecution of its members.

---

[33]   Defendants' motion for partial summary judgment.  (ECF No. 317 Def. Br. at 14-16 PageID.3559-61.)

Defendants request summary judgment on Count 11.  Defendants raise both factual concerns and legal arguments.  For Defendants' motion, the Court will assume KBIC purchased cigarettes from other federally recognized Indian tribes.

The Indian Commerce Clause grants Congress the authority to regulate commerce with Indian tribes.  U.S. Const., art. I, § 8, cl. 3.  The "central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs." *Cotton Petroleum*, 490 U.S. at 192.  Almost forty years ago, then sitting on the First Circuit Court of Appeals, Judge Steven Breyer wrote that the

> Supreme Court decisions since Chief Justice Marshall's time have generally rejected the concept that the Clause automatically and necessarily preempts all state laws dealing with Indians.  Instead, these decisions have tended to expand the area in which states may legislate.  And, when the Supreme Court has found state legislation preempted, it has used an analysis that balances the federal, state, and tribal authorities, rather than any rule that automatically preempts state statutes on the basis of the Clause.

*James v. Watt*, 716 F.2d 71, 73-74 (1st Cir. 1983) (internal citations and citations omitted).  So long as a state's tax laws "are applied in a nondiscriminatory manner to all transactions within the State [,]" "[i]t can no longer be seriously argued that the Indian Commerce Clause, of its own force, automatically bars all state taxation of matters significantly touching the political and economic interests of the Tribes." *Colville*, 447 U.S. at 157.  The TPTA applies uniformly throughout the state and applies to both tribal and nontribal entities.  Therefore, the TPTA is a nondiscriminatory statute.  KBIC does not argue otherwise.

Defendants have established that the Indian Commerce Clause does not provide an independent basis for preempting Michigan's tobacco tax or prohibiting Michigan from enforcing the TPTA.  KBIC has not identified any binding authority that would support

application of the Indian Commerce Clause as a shield against enforcement of a nondiscriminatory state tax.  In *Ramah*, the Solicitor General argued that the Court should amend the preemption analysis and rely on the dormant Indian Commerce Clause for on-reservation activities.  *Ramah*, 458 U.S. at 845.  The Court declined the invitation explaining that "the existing pre-emption analysis governing these cases is sufficiently sensitive to many of the concerns expressed by the Solicitor General."  *Id.* at 846; *see Otoe-Missouria Tribe of Indians v. New York Dept. of Fin. Servs.*, 769 F.3d 105, 117 n.9 (2d Cir. 2014) ("Although the Interstate Commerce Clause contains a 'dormant' protection that prohibits states from discriminating against interstate commerce, courts have never inferred that the Indian Commerce Clause contains a similar unspoken shield.").

Binding and persuasive authority supports the conclusion that Michigan can enforce the TPTA in the specific situations identified by KBIC in Count 11.  First, Defendants can tax on-reservation cigarette sales by Indian retailers to non-Indian purchasers.  The Supreme Court has held, on several occasions, that a state may tax cigarette sales in Indian country when the transaction involves a tribal retailer and a non-Indian consumer.  *See Milhelm*, 512 U.S. at 64; *Oklahoma Tax Comm'n v. Citizen Band of Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 512-13 (1991); *Colville*, 447 U.S. at 160-61; *Salish and Kootenai Tribes*, 425 U.S. at 483.  Second, a state can conduct off-reservation seizures of a tribe's tobacco products that violate state law. *Citizen Band of Potawatomi Indian Tribe*, 498 U.S. at 514; *Colville*, 447 U.S. at 161-62; *see Muscogee (Creek) Nation v. Oklahoma Tax Comm'n*, 611 F.3d 1222, 1237 (10th Cir. 2010) (involving the seizure of cigarettes and holding that the Indian Commerce Clause does not prevent a state from "enforcing its tax

laws outside Indian Country, even if such enforcement significantly touches the political and economic interests" of the tribe); *Narragansett Indian Tribe v. Rhode Island*, 449 F.3d 16, 21 (1st Cir. 2006) (*en banc*) ("It is beyond peradventure that a state may seize contraband cigarettes located outside Indian lands but in transit to a tribal smokeshop."); *Yakama Indian Nation v. Washington Dept. of Revenue*, 176 F.3d 1241, 1246 (9th Cir. 1999) ("In addition, the Supreme Court has specifically approved of states enforcing their tax laws through off-reservation seizure of unstamped cigarettes.") Third, because the alleged crime, transportation of contraband cigarettes, occurred off-reservation, Michigan has jurisdiction to prosecute KBIC's tribal members. *See Hicks*, 533 U.S. at 362 ("It is also well established in our precedent that States have criminal jurisdiction over reservation Indians for crimes committed (as was the alleged poaching in this case) off the reservation.") (citing *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148-49 (1973)).

For these reasons, Defendants are entitled to summary judgment on Count 11.

### L.  Count 12 - Tobacco Tax - Interstate Commerce Clause[34]

In Count 12, KBIC alleges that the Interstate Commerce Clause (1) prevents Michigan from treating KBIC's cigarettes as contraband, (2) precludes Michigan from using the state's tobacco tax act to seize KBIC's property and (3) prohibits the criminal prosecution of KBIC's members for violation of the state's tobacco tax act.

Defendants request summary judgment on Count 12.  Defendants raise only legal issues, not factual disputes.  Defendants assert that Count 12 raises a claim under the

---

[34]      Defendants' motion for partial summary judgment.  (ECF No. 317 Def. Br. at 17-18 PageID.3562-63.)

dormant Commerce Clause, and assertion KBIC does not deny.  Defendants argue that, through the CCTA, Congress allows states to enact and enforce laws addressing the transportation of contraband cigarettes in interstate commerce.  In addition, Defendants argue that federal courts have approved the seizure of tribal cigarettes outside of Indian Country as a lawful response to the unique problems posed by tribal sovereign immunity.

The Interstate Commerce Clause gives Congress the power to regulate commerce among the states.  U.S. Const., art. I, § 8, cl. 3.  By implication, the clause has a "negative" aspect such that a State cannot unjustifiable discriminate against or burden the flow of interstate commerce.  *American Beverage Assoc. v. Snyder*, 735 F.3d 362, 369 (6th Cir. 2013) (citation omitted).  This negative implication is referred to as the dormant Commerce Clause, and it restricts a State's ability to perform economic protectionism favoring in-state economic interests by burdening out-of-state competitors.  *Id.*; *see Dept. of Rev. of Kentucky v. Davis*, 553 U.S. 328, 337-38 (2008) ("The modern law of what has come to be called the dormant Commerce Clause is driven by concern about 'economic protectionism that is, regulatory measures designed to benefit the in-state economic interests by burdening out-of-state competitors.'") (citation omitted).  But, not all state regulations affecting interstate commerce are prohibited.  State taxes on activities connected with interstate commerce are "sustainable if it 'is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State."  *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 157 (1982) (quoting *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279 (1977)).

Courts consider the economic discrimination under the dormant Commerce Clause only when Congress has not acted or purported to act. *Merrion*, 455 U.S. at 154. "Once Congress acts, courts are not free to review state taxes or other regulations under the dormant Commerce Clause. When Congress has struck the balance it deems appropriate, the courts are no longer needed to prevent States from burdening commerce, and it matters not that the courts would invalidate the state tax or regulation under the Commerce Clause in the absence of congressional action." *Id.*; *see Fednav. Ltd. v. Chester*, 547 F.3d 607, 624 (6th Cir. 2008) (same)

Congress enacted the Contraband Cigarette Trafficking Act in 2006, 18 U.S.C. § 2341, *et seq.*, which supplements a state's enforcement of its own cigarette taxes, *United States v. Mohamed*, 759 F.3d 789, 809 (7th Cir. 2014). The CCTA explicitly states that the statute shall not be "construed to affect the concurrent jurisdiction of a State or local government to enact and enforce its own cigarette tax laws, to provide for the confiscation of cigarettes or smokeless tobacco and other property seized for violation of such laws, and to provide for penalties for the violation of such laws." 18 U.S.C. § 2345(a). The Sixth Circuit held that the CCTA was a valid exercise of Congress's authority under the Interstate Commerce Clause. *United States v. Abdullah*, 162 F.3d 897, 901-02 (6th Cir. 1998).

Defendants are entitled to summary judgment on Count 12. Because Congress has acted in the area of interstate cigarette transportation and relies on state tax laws to identify contraband cigarettes, KBIC's dormant Commerce Clause claim must be dismissed. *See Fednav, Ltd.*, 547 F.3d at 624 ("We would lose our constitutional bearing if we were to hold that the Commerce Clause, in its dormancy, strikes down a state regulation that Congress, it

*actively exercising* its power under the Clause, expressly contemplated.") (emphasis in

original).   KBIC has not demonstrated that the TPTA unfairly burdens or discriminates

against out-of-state economic interests.

O.  Count 15 - Sales and Use Taxes - § 1983 Monetary Damages[35]

In Count 15, KBIC seeks monetary damages under § 1983 for violations of its rights

arising from the sales and use taxes levied by Michigan against KBIC and its members.

Section 1983, 42 U.S.C. § 1983, provides

> Every person who, under color of any statute, ordinance, regulation, custom,
> or usage, of any State . . ., subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the deprivation
> of any rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity, or other
> proper proceeding for redress, . . . .

KBIC specifically alleges that the acts of Defendants Khouri and Fratzke give rise to this

claim.  Defendants raise a number of defenses.  Defendants question KBIC's ability to seek

some of the refunds and question whether any request for a refund was properly made for

some of the claims.  Defendants argues that KBIC is not a "person" under § 1983 because

the sales and use tax claims relate to KBIC's sovereign status.  Defendants contend that

KBIC's claim for refund or damages against Defendants in their official capacities should

have been filed in state court because Michigan enjoys immunity in federal court under the

Eleventh Amendment.  Defendants also argue that the alleged damages did not occur

---

[35]     Defendants' motion for partial summary judgment.  (ECF No. 317 Def. Br. at 44-47
PageID.3589-92.)

because of any act by a named defendant in his or her individual capacity. Defendants assert qualified immunity for the individual capacity claims.

### 1. Standing and Ripeness

Defendants assert that **KBIC** cannot seek refunds for taxes paid by members of the tribe. Defendants also argue that, for some of the specific refund requests, neither **KBIC** nor any member of the tribe filed the proper paperwork. After **KBIC** filed this lawsuit in 2016, the individual members of **KBIC** whose requests for refunds are included in the proofs executed assignments of their claims. (ECF No. 317-62.)

For the purpose of this particular standing concern of Defendants, when **KBIC** filed the complaint in 2016, it had standing to assert each claim and to seek tax refunds. Defendants do not dispute that **KBIC** paid sales and use taxes. A plaintiff must demonstrate standing for each claim presented and for each form of relief sought. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). And, "the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Id.* (citing *Friends of Earth, Inc. v. Laidlaw Environ. Serv., Inc.*, 527 U.S. 167, 180 (2000)). Each claim and prayer for relief arises from the imposition of and payment of taxes, something **KBIC** did before it filed this lawsuit.

The Court will, however, grant summary judgment and dismiss the portion of Count 15 seeking refunds for taxes paid by individual members of **KBIC**. At the time **KBIC** filed its complaint it did not have standing to seek a tax refund for the taxes paid by the individual members. Generally, an entity that did not pay the taxes "may not sue for a refund of taxes

paid by another." *Montana v. Crow Tribe of Indians*, 523 U.S. 696, 713 (1998) (citations omitted).  KBIC attempted to remedy that oversight during the course of the litigation through the assignments.  But, the post-complaint assignment does not cure the standing problem because "[t]he Supreme Court . . . has not explicitly overruled past precedent that confined the standing inquiry to the moment when the lawsuit was filed."  *Memphis A. Phyilip Randolf Inst. v. Hargett*, —F.3d—, 2021 WL 2547052, at *4 (6th Cir. June 22, 2021).  KBIC might have been able to remedy the problem with the late assignment simply by filing a supplemental complaint under Rule 15(d).  *See Northstar Fin. Advisors Inc. v. Schwab Investments*, 779 F.3d 1036, 1044-45 (9th Cir. 2015).  KBIC has not filed a supplemental complaint.  And, it is not clear to the Court that KBIC could litigate the tax refund claims on behalf of its individual members.  The Indian exception to the Tax Injunction Act, 8 U.S.C. § 1362, provides for federal court jurisdiction over civil actions brought by an Indian tribe or band and does not apply to suits by individual Indians.[36]  *Chippewa Trading Co. v. Cox*, 365 F.3d 538, 545 (6th Cir. 2004).

On this record, the Court also declines to dismiss any particular refund request on the basis of ripeness.  Viewing the evidence in the record in the light most favorable to KBIC, there remain questions of fact about the few claims identified by Melissa Thelen in her second declaration.  (ECF No. 317-38.)  Assuming KBIC prevailed on any claim for which

---

[36]    The parties have not discussed, and the Court has not considered, whether the assignments are valid.  The assignments require KBIC to remit any refund amount back to the individual who assigned the claim.  (*E.g.,* ECF No. 317-62 PageID.4082.)

it might recover damages, either at trial or in some post-trial proceeding, **KBIC** would have to establish that the disputed requests for refunds were properly submitted and then rejected.

### 2. KBIC as a Person under § 1983

Defendants argue **KBIC** is not a "person"—"any citizen of the United States or other *person* within the jurisdiction thereof"—who can sue under § 1983. The Supreme Court has held that an Indian tribe, like **KBIC**, cannot sue under § 1983 to vindicate its rights as a sovereign. *Inyo Cty., California v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony*, 538 U.S. 701, 712 (2003). The analysis requires consideration of the underlying statute that gives rise to the claim.

> As we have recognized in other contexts, qualification of a sovereign as a "person" who may maintain a particular claim for relief depends not "upon a bare analysis of the word "person," but on the "legislative environment" in which the word appears[.]

*Id.* at 711 (internal citations omitted). One district court applied the *Inyo* holding by posing a question: could the Tribe bring the claim if it were not a sovereign? *Texas v. Ysleta del Sur Pueblo*, 367 F. Supp. 3d 596, 606 (W.D. Tex. 2019). Using this question as the test,

> claims that are based on Tribal treaties, sovereign immunity, or other privileges granted only to sovereigns should be barred. On the other hand, if the claim is one that nonsovereign entities in similar situations could bring—even if the claim has some relation to the Tribe's sovereignty—then *Inyo County* should not preclude the claim.

*Id.*

Defendants are entitled to summary judgment on **KBIC**'s Count 15 § 1983 claim for damages based on sales and use taxes in Count 3 (challenge to sales tax based on tribal self-government) and Count 6 (challenge to sales tax based on the 1842 Treaty). Defendants are

also entitled to summary judgment on the Indian Commerce Clause claim in Count 4 and the Equal Protection Claim in Count 7, both of which arise based on KBIC's status as a tribe. Each of these claims depend entirely on KBIC's status as a sovereign.  Defendants are not entitled to summary judgment on KBIC's § 1983 claims for sales and use tax damages in Counts 1, 2, 5 and the Due Process claim in Count 7.  Each of those claims do not depend on KBIC's status as a sovereign.  Although the *Bracker* challenges in Count 2 does consider sovereignty as one of many factors, the claim does not arise because of KBIC's status as a sovereign.

### 3.  Eleventh Amendment and § 1983

Defendants argue that the Eleventh Amendment precludes any claim for a refund or damages that would ultimately be paid by Michigan.[37]  For Count 15, KBIC sued Nick Khouri and Walter Fratzke in their official and their individual capacities.  When a plaintiff sues an individual in his or her official capacity, the real party in interest in the entity for which the individual is an agent.  *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).  KBIC's official capacity claims against Khouri and Fratzke are, therefore, claims against Michigan. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State.").

The Eleventh Amendment generally prohibits an unconsenting state from being sued in federal courts by a citizen of that state or the citizens of another state.  U.S. Const. am. XI.

---

[37]      To be clear, Defendants do not assert Eleventh Amendment immunity as a reason for summary judgment against all claims.  Defendants assert only that the Eleventh Amendment bars KBIC's claims for refunds and damages.  (ECF No. 317 Def. Br. at 46 PageID.3591.)

Unless a state waives Eleventh Amendment immunity or unless Congress has validly overridden a state's Eleventh Amendment immunity, "[t]he Eleventh Amendment bars a damages action against a state in federal Court.  This bar remains in effect when state officials are sued for damages in their official capacity."  *Graham*, 473 U.S. at 169 (internal citation and citation omitted).  Generally, states have not waived Eleventh Amendment immunity from lawsuits by Indian tribes.  *Blatchford v. Native Vill. of Noatak and Circle Vill.*, 501 U.S. 775, 779-82 (1991).  And, Congress did not abrogate the Eleventh Amendment through 28 U.S.C. § 1362, which gives federal courts original jurisdiction over civil actions brought by Indian tribes.  *Id.* at 786-88.

Independent of the Eleventh Amendment, the Supreme Court has also held that a state is not a "person"—"Every person who, under color of any statute"—for the purpose of § 1983.  *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 69 (1989) ("We find nothing substantial in the legislative history that leads us to believe that Congress intended that the word 'person' in § 1983 included the States of the Union.").  Therefore, states cannot be sued for damages under § 1983.  *Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 (1997) ("We have held, however that § 1983 actions do not lie against a State.  Thus, the claim for relief that the Ninth Circuit found sufficient to overcome mootness was nonexistent. The barrier was not, as the Ninth Circuit supposed, Eleventh Amendment immunity, which the State could waive.  The stopper was that § 1983 creates no remedy against a State.") (internal citation omitted).

Defendants are entitled to summary judgment for any damage claims against the individual defendants sued in their official capacities.

4.  Qualified Immunity

For KBIC's claim against Khouri and Fratzke in their personal capacities, KBIC seeks to impose personal liability on the two defendants for actions taken under color of law.  *See Graham*, 473 U.S. at 165.  Defendants argue that they are entitled to qualified immunity. Defendants argue they have made a good faith attempt to interpret and apply the legal principles in the Supreme Court's Indian tax cases.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity is a legal question for the court to resolve.  *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009) (citing *Elder v. Holloway*, 501 U.S. 510, 516 (1994)).  When resolving a governmental employee's assertion of qualified immunity, the court determines (1) whether the facts the plaintiff has alleged or shown establishes the violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the incident.  *Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560, 567 (6th Cir. 2013) (citing *Pearson v. Callahan* 555 U.S. 223, 232 (2009)).  Courts may examine the two prongs in any order, depending on the facts and circumstances of the case. *Id.* at 567-68.  Once the qualified immunity defense is raised, the plaintiff bears the burden of demonstrating both that the challenged conduct violates a constitutional or statutory right and that the right was so clearly established at the time that "'every reasonable official would have understood that what he [was] doing violate[d] that right.'"  *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)) (alterations in

*T.S.*).  "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.  When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *al-Kidd*, 563 U.S. at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Defendants Khouri and Fratzke are entitled to qualified immunity for the sales and use tax claims brought against them in their individual capacities.  With the exception of the use tax, the Court has found that neither Khouri's acts nor Fratzke's acts violated federal law.  Khouri and Fratzke would thus be entitled to qualified immunity for any claim other than claims related to the use tax.  For use tax claims, the Court concludes that the problem was a lack of apportionment, something not permitted by the state statute.   *See* Mich. Comp. Laws § 205.93(1).  "The Supreme Court tells us that public officials should generally receive qualified immunity when enforcing properly enacted laws."  *Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 441 (6th Cir. 2016).   State statutes generally are afforded a presumption of constitutionality.  *Id.* "When public officials implement validly enacted state laws *that no court has invalidated*, their conduct typically satisfies the core inquiry—the 'objective reasonableness of an official's conduct'—that the immunity doctrine was designed to test."  *Id.* (emphasis added) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Khouri and Fratzke are entitled to qualified immunity for claims arising from use taxes because they were simply enforcing the state statute as written, a statute no court has invalidated.

## P.  Count 16 - Tobacco Seizures - § 1983 Monetary Damages[38]

KBIC alleges that Defendants Khouri, Fratzke, Croley, Grano and Sproull were each involved in the planning, authorizing, and conducting the seizure of KBIC's truck, trailer, and cigarettes.  KBIC asserts that it has been injured by these actions, including money damages for the value of the seized property, loss of revenue, loss of use of the property, and the cost of challenging the seizures.  (Compl. ¶ 183 PageID.849-50.)  The Court interprets the claim as one seeking money damages.  Defendants raise many of the same defenses here as they did to the § 1983 claim for sales and use tax refunds.

### 1.  KBIC as a Person under § 1983

For the reasons previously explained, KBIC cannot sue as a "person" under § 1983 when it seeks to vindicate its rights as a sovereign.  Defendants are entitled to summary judgment for KBIC's Count 16 § 1983 claim for money damages as those damages relate to Count 10 (tobacco taxes and cigarette seizures interfere with tribal self-government).  Defendants are also entitled to summary judgment on any claim for money damages related to Count 11 (tobacco taxes and cigarette seizures are preempted by the Indian Commerce Clause).  KBIC's claims for damages related to those Counts necessarily rely on its status as a sovereign.  *See Muscogee*, 611 F.3d at 1234-35.  Defendants are not entitled to summary judgment for Count 16 for money damages related to Counts 5, 9 and 12 as those counts do not depend on KBIC's status as a sovereign.

### 2.  Eleventh Amendment and § 1983

---

[38]     Defendants' motion for partial summary judgment.  (ECF No. 317 Def. Br. at 19-22 PageID.3564-67.)

For the reasons previously explained, KBIC cannot seek money damages under §
1983 against Michigan.  Defendants are entitled to summary judgment for Count 16 for any
claim for money damages brought against them in their official capacities.

### 3.  Comity Principles and the Tax Injunction Act

Defendants argue that, applying principles of comity, federal courts should ordinarily
abstain from constitutional challenges to state tax systems.

Federal courts adhere to a "broad federal common-law principle of comity that
governs constitutional challenges to state tax administration." *Chippewa Trading Co.*, 365
F.3d at 541.  The principle arises from several Supreme Court cases and generally prohibits
taxpayers from asserting § 1983 claims against the validity of state tax systems in the lower
federal courts.  *Id.* (citation omitted).  In these cases, federal courts should abstain from
resolving claims where a "'plain, adequate, and complete' remedy is available to the plaintiff
in state court." *Id.* (citation omitted).  The same concerns led Congress to enact the Tax
Injunction Act, 28 U.S.C. § 1341.  *Id.*  The limitations on suits in the Tax Injunction Act,
however, do not prevent civil actions brought by Indian tribes; the limitation extends to
individual Indians and private Indian corporations.  *Id.* at 545.  The Sixth Circuit has
suggested that when a case falls "within the ambit of § 1362," the comity principles favoring
abstention likely do not apply.  *Id.* ("suspect[ing]" that abstention would not apply to a suit
brought by a tribe and noting that, even if it were true, the plaintiff was not an Indian tribe or
band).

Defendants are not entitled to summary judgment on Count 16 based on comity
principles and the Tax Injunction Act.  KBIC is a federally-recognized tribe and the Court

has jurisdiction under § 1362, which undermines the principles of comity that would otherwise apply.

### 4. Individual Liability and Qualified Immunity

Defendants argue that the individual defendants, sued in their personal capacities, cannot be held vicariously liable.  Defendants also argue that they are entitled to qualified immunity.

Under § 1983, state officials can be held liable in their individual capacities "only for their own unconstitutional behavior." *Colvin v. Caruso*, 605 F.3d 282, 292 (6th Cir. 2010) (citation omitted).  Nor can supervisory officials be held liable based on their ability to control other employees.  *Heyerman v. Cty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012).  "At a minimum, a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.* (quoting *Hays v. Jefferson Cty.*, 668 F.2d 869, 874 (6th Cir. 1982)).

### a. Defendant Khouri and Defendant Fratzke

Defendant Khouri and Defendant Fratzke are entitled to qualified immunity for the tobacco tax related claims brought against them in their individual capacities.  KBIC contends Khouri is "responsible for the policies and actions of the Department." (ECF No. 370 Pl. Resp. at 32 PageID.5606.)  KBIC contends that Defendant Fratzke "carried out those policies with respect to imposition of the Sales and Use Taxes."  (*Id.*)  KBIC has not established, with any evidence in the record, any personal involvement by Defendants Khouri or Fratzke regarding the enforcement of tobacco taxes or the seizures of KBIC's cigarettes.  At best, KBIC asserts responsibility based on Khouri's official duties as

Michigan's Treasurer and Fratzke's official duties in his position as the Native American Affairs Specialist.   KBIC's allegations for these two defendants establish only vicarious liability.

### b.  Defendant Grano and Defendant Sproull

Defendants filed a separate motion for partial summary judgment for the claims brought against Defendants Grano and Sproull.  (ECF No. 98.)  The Court recently issued an Opinion and Order granting in part that motion.  (ECF No. 421.)  The Court already concluded that Grano and Sproull were entitled to immunity from the claims related to the seizure of cigarettes.  KBIC has not alleged any other claims against Grano and Sproull. Accordingly, the Court finds moot Grano and Sproull's request for qualified immunity in this motion.

### c.  Defendant Croley

Defendants argue Croley was not involved in any investigation or in the traffic stop or seizure of tobacco products in Iron County.   KBIC pleads that Defendant Croley "coordinated, authorized, and executed the seizures of tobacco products and other Community property at issue in this action." (Compl. ¶ 10 PageID.795.)  As evidence, KBIC points to a portion of Croley's deposition where he admits to conducting an investigation "within the exterior boundaries of the KBIC reservations."  (ECF No. 336-4 Croley Dep. at 81 PageID.4712.)

Defendant Croley is entitled to qualified immunity for tobacco tax related claim brought against him in his individual capacity.  The Court concludes that Defendants are entitled to summary judgment for Count 10 for claims arising from the investigation in

KBIC's Indian country.  Because the investigation did not violate KBIC's rights, KBIC has

no claim against Croley.  And, KBIC has not identified any Supreme Court or even federal

appellate court authority showing clearly established law concerning the legal principle that

law enforcement cannot conduct an investigation on an Indian reservation.

### Q.  Permanent Injunction and Attorney Fees[39]

KBIC requests a permanent injunction (Count 17) and attorney fees (Count 18).

Defendants argue that KBIC is not entitled to either prayer for relief.  For the injunction,

Defendants contend KBIC has not established any continuing harm.

The Court will grant KBIC an injunction preventing Michigan from enforcing the use

tax to the extent that Michigan does not permit apportionment of the tax to distinguish

between on-reservation and off-reservation use.  The Court declines to rule on any request

for attorney fees as premature.

### VI.

The Court concludes that the disputed claims can be resolved on the cross motions

for partial summary judgment.  The parties generally agree on the material facts and the

claims can be resolved a question of law.  Defendants are entitled to summary judgment for

all of the claims arising from sales taxes, including the claims arising from the process of

exemptions and refunds.  Neither KBIC nor the tribal members bear the burden of those

taxes, the taxes are not *per se* unconstitutional, and the balance of factors in the *Bracker* test

do not weigh in favor of finding federal preemption.  The other challenges to the sales tax

---

[39]     Defendants' motion for partial summary judgment (ECF No. 317 Def. Br. at 48-49
PageID.3593-94.)

fail.  Defendants are entitled to summary judgment for all of the claims arising from tobacco taxes, including those related to the seizure of cigarettes.  The Supreme Court has largely rejected, in other contexts, explicitly or implicitly, each of the arguments KBIC raises here about Michigan's tobacco taxes.  Finally, Defendants have established that the Court cannot award KBIC damages in this lawsuit.  KBIC cannot overcome Michigan's immunity under the Eleventh Amendment.  The Court concludes that each of the defendants, sued in their individual capacities, are entitled to qualified immunity.

KBIC is entitled to summary judgment on Count 5, its claim arising from Michigan's use taxes.  The Supreme Court has found unconstitutional similar use or excise taxes.  At least on the arguments presented here, this Court cannot meaningfully distinguish between the taxes involved in the Supreme Court's opinions and Michigan's use tax.  Accordingly, KBIC is entitled to an injunction against enforcement of the use tax as it is presently interpreted by Michigan.

The Court will issue an Order contemporaneous with this Opinion.

Date:  July 13, 2021                                  /s/ Paul L. Maloney
                                                                      Paul L. Maloney
                                                                      United States District Judge